## ALLEN v. PHILADELPHIA CO. et al.

(District Court, W. D. Pennsylvania. April 10, 1919.)

1. **Corporations ⬤➞591—Bill by bondholder against corporation, party to consolidation, held without equity.**

A bill by a bondholder of a corporation *held* not to state a cause of action for equitable relief, by charging another corporation and its property with liability for the bonds, on the ground that the same persons control both corporations, and that the second, through stock ownership, has caused the mortgagor to lease and operate other properties to its own detriment, but to the profit of the controlling company, where no fraud or violation of law is alleged.

2. **Corporations ⬤➞473—Mortgage bondholder can only sue on refusal of trustee.**

A bondholder secured by mortgage to a trustee cannot maintain a suit against another corporation for causing depreciation of the mortgaged property, unless it is alleged and shown that the trustee has neglected and refused to act.

In Equity. Suit by Benjamin C. Allen, on behalf of himself and other bondholders of the United Traction Company of Pittsburgh against the Philadelphia Company, the Pittsburgh Railways Company, and the United Traction Company of Pittsburgh. Hearing on points of law. Bill dismissed.

Decree affirmed 265 Fed. (C. C. A.) 817.

George Wharton Pepper, of Philadelphia, Pa., and Thomas Patterson and Robert Woods Sutton, both of Pittsburgh, Pa., for plaintiff.

George B. Gordon and Edwin W. Smith, both of Pittsburgh, Pa., for defendants.

ORR, District Judge. This matter comes before the court upon a motion, ex parte plaintiff, that the court hear separately the points of law raised in the answer and dispose of the same before the trial of the principal case. The material allegations of the bill are as follows: Plaintiff is the owner of $9,000, at par, of 5 per cent. gold bonds issued by United Traction Company, under date of July 9, 1897, and secured by mortgage of even date to the Maryland Trust Company, as trustee for bondholders. The Philadelphia Company is a corporation organized under a special act of the Legislature of Pennsylvania, dated March 22, 1871 (Acts of 1873, P. L. 955); Pittsburgh Railways Company is a corporation of Pennsylvania, organized under a special act of the Legislature of that state, approved May 25, 1871 (P. L. 1170), the original corporate name being Surety Contract Company; United Traction Company is a corporation organized under the laws of Pennsylvania and was incorporated July 6, 1896.

In 1897 a syndicate composed of certain individuals (which are not named or otherwise identified in the bill) undertook to consolidate three different traction systems in the cities of Pittsburgh and Allegheny, to wit: Second Avenue Traction Company, the North Side Traction Company, and Pittsburgh, Allegheny & Manchester Traction Company, each of which, at that time, was operating several street

---

railway lines, and to form these three into one system, known as the United Traction Company of Pittsburgh. As part of the plan of consolidation, and for the purpose of financing the same, said syndicate caused the above-mentioned mortgage to be made, pledging as security for an authorized issue of $10,000,000 of said bonds, due July 1, 1997, all the property and franchises owned or controlled by said several systems, which together constitute a complete street railway system for the transportation of passengers in and through large sections of the cities of Pittsburgh and Allegheny and vicinity. Of said $10,000,000 of bonds so authorized, it was provided that bonds aggregating in amount $5,275,000 should be reserved to pay off underlying bonds as they should mature, that $725,000 of said bonds should be reserved for betterments, etc., and that the remaining $4,-000,000 should be issued in payment for the property conveyed to the United Traction Company, all of which remaining $4,000,000 were issued shortly after the execution of said mortgage, and that subsequently $804,000 of said bonds were issued either for betterments or for retiring the above-mentioned bonds.

The said syndicate caused the United Traction Company to issue $3,000,000 par value of preferred stock and $17,000,000 par value of common stock, and caused said preferred stock to be sold, and the proceeds thereof, together with the proceeds of the aforesaid bonds, were used to pay the purchase price of the property so acquired by the United Traction Company; and said syndicate caused the $17,000,-000 par value of the common stock to be issued and delivered to it without paying to the United, or to its subsidiary companies, any real or cash value therefor.

At and before February 1, 1899, the property of the United and of its several lessors was in good operating condition, and their equipment and rolling stock of modern type and in good order. The net earnings of the United were large enough to pay fixed charges, a dividend of 5 per cent. upon the preferred stock, and to show a surplus to the credit of the company. The said mortgage of July 9, 1897, contained the usual provisions with respect to entry and foreclosure in the event of default, and if there had been a default prior to the acts charged in the bill to have been done by the Philadelphia Company, and the provisions of said mortgage had been invoked by reason of such default and a sale have taken place under the mortgage, there would have been exposed for sale a street railway system complete in itself, capable of maintaining itself and earning interest on its bonds.

Shortly after the completion of the organization of the United, and in the year 1898, the owners and holders (none of whom are named in the bill) of the $17,000,000 of common stock of said company, acting in concert as a syndicate, acquired control of the entire capital stock of the Philadelphia Company, which was, at that time, engaged exclusively in supplying natural gas for fuel in said cities, of the Consolidated Gas Company, which at that time controlled the distribution of artificial gas in said cities, of the Allegheny County Light Company, which was furnishing electricity in said cities and was at that

time the only company engaged in such business, and of the Chartiers Valley Gas Company, which was engaged in the supply of natural gas in the same territory.

Immediately upon acquiring control of the capital stock of the Philadelphia Company in February, 1899, the said syndicate caused certain of its members and appointees to be elected directors and officers of said Philadelphia Company, and caused the latter to take over the entire common capital stock of the United Traction Company, and to issue capital stock of the Philadelphia Company in payment therefor, and also to take over, and in the same manner to pay for, the entire common capital stock of the Consolidated Gas Company and for the entire capital stock of the Allegheny County Light Company and of the Chartiers Valley Gas Company. The Philadelphia Company held said $17,000,000 of the common stock of the United which it had received, with full knowledge of all the facts hereinbefore recited, including knowledge of want of consideration for its issue, until 1912, when it transferred it to the Pittsburgh Railways Company.

Having thus acquired complete control of the United, the Philadelphia Company proceeded to operate the United as a part or department of its own business, electing its officers and employés as officers and members of the board of directors of the said United and used the same employés as the employés of both companies. On and after February, 1899, and prior to January 1, 1902, the said Philadelphia Company and the persons controlling and operating the same, from time to time, acquired other railway systems or street railways and inclined planes in the cities of Pittsburgh and Allegheny and vicinity, together with their equipment used to operate said systems and railway lines, so that immediately prior to the date last mentioned it owned or controlled practically all the street railways operating in said cities and the immediate vicinity thereof. The Philadelphia Company, in order to operate the same as a complete system, caused various leases to be made and certain operating contracts to be executed between the various companies, without regard to the needs of the various individual companies, without affording said individual companies any benefit therefrom, or such benefit as they would have received had they been under their own management and operated as distinct and separate systems, or as they would have received had they been operated or managed otherwise than in the interests of the Philadelphia Company, which said leases and operating agreements enabled the Philadelphia Company to ignore and disregard the separate corporate existence of the various companies, in so far as it was to its advantage to do so, while at the same time, to retain and use the separate corporate charters, when desired, for its own advantage.

As part of said plan, on or about January 1, 1902, the Philadelphia Company caused leases to be made by the Pittsburgh & Birmingham Traction Company, Pittsburgh & Charleroi Street Railway Company and subsequently by other street railway companies, to the United, which said leases imposed upon the United the duty of keeping the demised premises in good repair and condition and fully equipped with the best and most improved equipment. The property and fran-

chises of each of these lessor 'corporations were subject to the lien of mortgages securing bond issues, which in the case of the Pittsburgh & Birmingham Traction Company amounted in' the aggregate to $1,500,000, and in the case of the Pittsburgh & Charleroi Street Railway Company amounted to $2,445,000. The Philadelphia Company, being the owner of all the capital stock of the corporation known at that time as the Southern Traction Company, caused the name of the latter to be changed to the Pittsburgh Railways Company, and caused its own officers, directors, and employés to be elected officers and directors of said Pittsburgh Railways Company, to which the said Philadelphia Company assigned and delivered the greater part of its holdings of traction company stocks. On December 30, 1901, but as of January 1, 1902, the United Traction Company and Pittsburgh Railways Company. entered into a contract, which was executed on the part of each of said corporations by the same individual as president of the same respectively, and by the same individual as secretary thereof respectively, whereby the Pittsburgh Railways Company agreed to maintain and operate the several lines·of railway leased and operated by the United, for a period of 5 years, and thereafter until the agreement was terminated by 3 months' notice from one party to the other. In consideration thereof, it agreed to operate, and as well also to pay, all expenses ·of operation and maintenance, taxes, interest upon loans, and rentals which the United might be required to pay, and to pay current dividends upon the preferred stock of the United at 5 per cent. per annum, and a dividend upon the common stock of the United of 1 per cent. per annum, in consideration whereof it was stipulated in said agreement that Pittsburgh Railways Company should take possession and operate the railways of the United, with full freedom, observing, however, the obligations imposed upon the United by law or by contract, and that during the term the Pittsburgh Railways Company should receive returns of every kind which the United otherwise might be entitled to. It was further stipulated that the Pittsburgh Railways Company should have the right to operate said property in the corporate name of the United, if it desired, that the United would co-operate for the successful operation thereof, and that, while the former should pay the expenses of ordinary maintenance, the latter should provide funds for extraordinary repairs, betterments, etc.

Since March of 1899, the railway system of the United has been operated by the Philadelphia Company, and since January 1, 1902, has been operated by the Pittsburgh Railways Company. The Philadelphia Company has, at all times, enjoyed the financial advantages incident to the inclusion of the United system of railways in the railway system operated by the Pittsburgh Railways Company. The credit of the Philadelphia Company has been, in a large degree, built up upon the faith of its control of the United system, and the fact of such control has been advertised by the Philadelphia Company as an·important element of security behind the latter's obligation. The common stock of the United has been pledged by the Philadelphia Company as security for certain of said obligations.

Under the control of the Pittsburgh Railways Company, the property and franchises which together constitute the security for the bonds owned by the plaintiff and others, as well as the properties and franchises of the other passenger railway systems operated and controlled as hereinbefore set forth, have been merged in the mass of street railway properties and franchises operated as a unit by the Pittsburgh Railways Company; the cars running over what were once the tracks of the United are cars belonging to the Pittsburgh Railways Company. The accounting system pursued treats of the street railways as a unit, so that it is not possible to determine the receipts and disbursements of any part of the system. All receipts pass into a common treasury, and out of said treasury payments have been made by the Philadelphia Company indiscriminately to meet interest accruing on all the bonds of all the multitudes of corporations included in the system. This commingling and confusion of properties has for years made it impossible to apply the receipts from the properties subject to the lien of the mortgage securing the plaintiff's bonds to the payment of the interest charges, and payment of the same by the Philadelphia Company has been necessitated by the nature of the method of operation. Moneys have been paid by the Philadelphia Company for street railway purposes (in the form of loans to the Pittsburgh Railways), which have been derived in whole or in part from the receipts of the Philadelphia Company's artificial gas business, its natural gas business, and its electric light business. The car routes and schedules take no account of the limits of the United's system, the identity of which is no longer recognized by the public, and the good will of which has been lost in the combination.

The Philadelphia Company and the Pittsburgh Railways Company have failed to keep said property in operating condition, have failed to perform the covenants by which the United is bound under the terms of leases above referred to, have failed to perform the covenants of the contract of January 1, 1902, in regard to maintenance, have permitted the car barns and power plants of the United and its subsidiaries to be dismantled, have suffered the rolling stock and equipment of the United and its lessors to become obsolete and worn out, without setting aside any funds for its replacement or making any effort to replace the same, with the result that at the present time the United is without rolling stock or equipment wherewith to operate its own property or that of its lessors, and have caused the United to incur an enormous floating debt, while, during the same period, dividends upon the common stock of the United, to the aggregate amount of some $1,700,000, have been paid to the Philadelphia Company. By causing the United and all other underlying traction companies to discontinue the manufacture of their own electric power, and to purchase such power from the Duquesne Light Company, which is owned by the Philadelphia Company, there has been diverted a large revenue from the United and the other traction companies, which has been transferred to the Philadelphia Company.

By the terms of the above-mentioned contract of January 1, 1902, the Pittsburgh Railways Company covenants to pay 5 per cent. per

annum on the preferred stock of the United. This payment was regularly made by the Philadelphia Company, through the Pittsburgh Railways, until 1915. In that year the payment was omitted, and the Philadelphia Company asserted a right to apply the covenanted dividends in relief of obligations properly resting upon the Philadelphia Company. The preferred stockholders of the United, in dissent, filed a bill in this court, praying leave, whereupon the Philadelphia Company purchased the outstanding preferred stock, being $25 per share on a par value of $50 per share, to those who wanted cash, and $33.33 per share on a par value of $50 per share to those willing to take payment in Pittsburgh Railways Bonds guaranteed by the Philadelphia Company. The Philadelphia Company has refused, and is refusing, to recognize an obligation to continue interest payments on bonds issued under the United mortgage of 1897 and upon the bonds of a large number of other corporations which have, like the United, lost their identity in the common mass. On January 1, 1918, the Philadelphia Company failed to provide funds for the payment of interest then maturing on the United bonds and on the bonds of a number of other street railway corporations, thereby causing defaults to occur in violation of the covenants in said bonds contained. The fair market value of the assets of the United Traction Company, subject to the lien of the mortgage securing plaintiff's bonds in their present condition, is much less than the amount due on said bonded indebtedness, and the unsecured indebtedness of said company is largely in excess of any assets not subject to the lien of said mortgage.

[1] Having set forth the facts as they are to be found in the bill, it is well to note that the plaintiff does not "claim fraudulent intent on the part of the officers of these companies," and does not "seek to recover by reason of any particular fraud," and that it does not "seek to recover on the ground of any improper or tortious acts committed by the officers of the Philadelphia Company and its subsidiaries." The language in the quotations immediately preceding is the language of the learned solicitors for the complainant as found in their brief. Their contention is:

"That the natural and inevitable result of the attempt of one corporation to actively operate numerous subsidiary companies, naturally competitive and with conflicting interests, was a diversion of the business of many of those companies in favor of others and the growth of one at the expense of another."

Because of the neglect to charge fraud and the disclaimer of any right to recover upon the ground of improper or tortious acts, the court has considered a number of averments of the bill, although in form of averments of fact, to be, however, but conclusions of the pleader, as, for instance, the averment in the eleventh paragraph of the bill that the Pittsburgh Railways Company holds the $17,000,000 at par value of the common stock of the United for the Philadelphia Company, and the averments elsewhere to the effect that the Philadelphia Company was operating the United Traction Company merely as an instrumentality and adjunct of its own business, and averments to the effect that the Philadelphia Company, through the Pittsburgh

Railways Company, exercised control of the property of the United, etc.

The prayers of the bill are briefly: (1) Discovery; (2) that the Philadelphia Company be decreed liable to pay the interest accrued and hereafter to accrue upon bonds issued by various corporations, particularly upon the bonds of plaintiff and others issued under the said mortgage of July 9, 1897; (3) that the bonds owned by the plaintiff, as well as the remainder of the same issue, be decreed to be an obligation of the Philadelphia Company and be charged as, a lien on all of its property; (4) that the Philadelphia Company be restrained from suffering further defaults to occur under bonds secured by mortgages upon any of its street railway properties and from doing or suffering any other act or thing which may threaten to dismember its street railway system and thereby further unfit it for public service and impair its value as a whole; and (5) other and further relief.

The questions of law raised by the answer of the Philadelphia Company are six in number, and they include the questions raised in the joint answer of the other defendants: (1) The averments of the bill do not make out any cause of action. (2) The bill does not disclose any right of discovery. (3) There is a misjoinder of the parties. (4) No relief is prayed for against any of the defendants, except the Philadelphia Company. (5) The relief asked for cannot be granted in this proceeding. (6) The plaintiff has no right to maintain his bill. The cause of action, if any, with respect to the matters and things referred to in the bill, is vested in the Maryland Trust Company, as trustee. The plaintiff does not aver that he ever requested said trust company to take any action in the premises, or that it refused to do so.

The plaintiff invokes and relies upon the principle of the common law, which has existed anterior to the statutory enactments which provided for the creation of corporate entities and prescribed their powers and limitations. As stated in plaintiff's brief:

"It is the principle that the man who stands in the background and exercises the ultimate control over a business and draws down the profits, if there are any, must stand good for the liabilities of the business, even if the creditor did not know of the existence of the owner and never intended to give him credit."

The plaintiff deprecates the application to this case of another principle which is stated in his brief as follows:

"The second principle is that, to encourage business enterprise, a group of people may escape from the liability resulting from the first principle by becoming stockholders in the corporation which incurs the debts, provided an adequate corporate estate is assured for the payment of debts, and provided this corporate estate is not so dealt with as to make incorporation an instrument of injustice."

All of the defendant corporations and their subsidiaries are creatures of the state of Pennsylvania, and so far as appears no one of them has violated any statute of that state. That there may exist among them interlocking directorates raises no presumption that any of the

directors have failed in the discharge of their duties; that they are controlled by a sole owner of the shares of the corporation of which they are directors cannot be presumed. They are elected from year to year for a specific term, and cannot be removed from office without cause other than the whim of the owner or owners of the stock. Were they to agree to do the bidding of the person or persons electing them to office, such agreement would not be binding. It cannot be assumed that close business relationship will induce the performance of unlawful acts.

Again, it is not even suggested in the bill that any of said corporations were created in order to be mere instrumentalities for the purpose of carrying out a plan or scheme of disposing of assets belonging to those who called them into being. Yet this court of equity is asked to apply to the facts in this case the first principle of law above stated, and to disregard the second; in other words, to lay its hands upon some substance other than the corporate entities whose interrelation has been set forth at length in the bill.

Plaintiff relies upon a recent decision of the Circuit Court of Appeals of this Circuit in Brown v. Pennsylvania Canal Co., 235 Fed. 669, 149 C. C. A. 89, in support of his contention. That case is wholly different from that which is now before us. It was a decision dependent upon the particular state of facts before the court. In that case, the Pennsylvania Railroad Company was the owner of certain properties, subject to the liens of mortgages securing issues of bonds. There was no provision by which such properties could be sold free of liens. The obligations were approaching maturity. In such a situation, the said railroad company, in an annual report, signified its purpose to change the manner of holding said properties by the organization of a separate company and to pursue a plan for raising money by a mortgage upon them. Accordingly the railroad company caused the Pennsylvania Canal Company to be incorporated, and sold to the canal company the fee of the said properties, taking in exchange therefor nearly all the capital stock of the canal company. By further steps the canal company was authorized to borrow money and pledge its property by mortgages, and immediately after receiving such authority proceeded to discharge its underlying obligations and raise additional money by a new mortgage securing bonds. The railroad company entered directly into the mortgage transaction and voluntarily assumed a contractual obligation in connection with it, which was the agreement by the railroad company to purchase all coupons upon which the canal company might default. The occasion for the mortgage was unusual; the mortgage was an unusual one, containing many unusual features. Among these were the right of the canal company to abandon and dispose of the properties at private sale, clear of the lien of the mortgage, and apply the proceeds to the purchase of the bonds, and the right of the trustee, upon default of interest payments, to enter upon the premises and operate them, or to sell them at public sale, and, in either event, to apply the income or proceeds, first to interest, and then to principal. The mortgage contained a provision for an annual payment into a

sinking fund for the payment of the principal of the bonds, which sinking fund should, from time to time, be invested in the bonds secured by the mortgage or any other good securities.

As time passed, the railroad company reacquired the properties subject to the said mortgage upon terms fixed by the man who represented both the railroad company and the canal company. The sinking fund provision of the mortgage, although complied with for some years, was subsequently neglected; bonds purchased with the sinking fund were canceled. In that way the railroad company was relieved from its obligation to pay the coupons upon such bonds and was a direct party to the diversion of assets from the holders of the bonds to its own uses. The railroad company, was dealing with its own property all the time, employing, for its convenience, the canal company as its instrument and using, without doubt, the money of others. The railroad company, in that case, had avowed its purpose to operate and dispose of the canal properties through a separate corporation. The decision of the court, however, does not rest upon the theory that stock ownership gave the power of control, but upon the exercise of that power and not upon its mere possession. The railroad company exercised that power upon property which it owned before the expression of its purpose to deal with it, and which it reacquired free from lien in pursuance of such purpose. Of course, the railroad company was held liable to the bondholders of the canal company.

The principle which controlled the decision of that case should not control the case now before us. It is not helpful to consider separately other cases cited on behalf of plaintiff in which the decision depended upon its particular facts. None are more applicable than the case of Brown v. Pennsylvania Canal Co., supra.

[2] The law is with the defendants. The bill cannot be sustained, because the trustee in the mortgage which secures the plaintiff's bonds is not the plaintiff; there being no averment that such trustee had been requested to institute the proceedings and refused to do so. This is not a case where the holder of a security is seeking to enjoin a trespass, meaning thereby an unlawful act done with violence or force to the property which affords him his security, as in the case of Carter v. Fortney (C. C.) 170 Fed. 463. It is a proceeding where a bondholder seeks to impose a lien, for the benefit of all the bondholders, upon property not embraced within the mortgage made to the trustee for such bondholders. That purpose is apparent from reading the averments of the bill as a whole, and is specially summarized in the third prayer of the bill. Another purpose of the bill, as indicated by the fourth prayer thereof, is to prevent the dismemberment of a street railway system of which the mortgaged premises constituted a part.

This case is not, therefore, an exception to the rule as laid down in Jones on Corporate Bonds and Mortgages (third edition of Railroad Securities) § 388, p. 427, and cases there cited:

"Ordinarily, a bondholder secured by a mortgage to trustees is not allowed to sue the corporation with respect to any matter within the trust, except when it appears that the trustees refuse or neglect to act, or they stand in a

hostile position or have assumed a position prejudicial to the interests of the bondholders, or there is a vacancy in the office. Such neglect, refusal, or vacancy he must allege and prove."

One reason for this rule may be found in the fact that a suit like the present is not a representative or class suit, which would bind those not joining therein, or who were not privies to those who do. Wabash Railroad Co. v. Adelbert College, 208 U. S. 38, 58, 28 Sup. Ct. 182, 52 L. Ed. 379. Therefore the plaintiff's bill must fall. Moreover, as has been already indicated, the bill must fail for want of sufficient averments to bring it within the exceptional cases where courts will look behind the corporate forms. This is not a case involving the state, where courts should lend their aid to carry out legislative intent. In the absence of allegations of fraudulent intent, the case cannot be maintained upon any theory of agency or of trust relationship.

The case of Salomon v. Salomon & Co., in the House of Lords Law Reports, 1897, Appeal Cases 22, which deals with a Companies Act of England and a one-man company formed under that act, is always interesting. The language of Lord Macnaghten, on page 51, Id., is as follows:

"When the memorandum is duly signed and registered, though there be only seven shares taken, the subscribers are a body corporate 'capable forthwith,' to use the words of the enactment, 'of exercising all the functions of an incorporated company.' Those are strong words. The company attains maturity on its birth. There is no period of minority—no interval of incapacity. I cannot understand how a body corporate thus made 'capable' by statute can lose its individuality by issuing the bulk of its capital to one person, whether he be a subscriber to the memorandum or not. The company is at law a different person altogether from the subscribers to the memorandum; and, though it may be that after incorporation the business is precisely the same as it was before, and the same persons are managers, and the same hands receive the profits, the company is not in law the agent of the subscribers or trustee for them. Nor are the subscribers as members liable, in any shape or form, except to the extent and in the manner provided by the act. That is, I think, the declared intention of the enactment. If the view of the learned judge were sound, it would follow that no common-law partnership could register as a company limited by shares without remaining subject to unlimited liability."

The facts in the present case are, in some ways, similar to the facts in the case of Pullman Car Co. v. Missouri Pacific Co., 115 U. S. 587, 6 Sup. Ct. 194, 29 L. Ed. 499. A demurrer in that case was sustained by the court below, and such decree was affirmed by the Supreme Court. So far as appears, the principles controlling the court in that decision have not been changed. It would be of little profit to touch upon each of the grounds of demurrer, or to comment at length upon the authorities. This opinion has already been extended to what may seem to many an undue length.

The demurrer must be sustained.