## ALLEN v. PHILADELPHIA CO. et al.

(Circuit Court of Appeals, Third Circuit. March 23, 1920.)

No. 2473.

Corporations ⟲⟿590(3)—Corporation lawfully acquiring stock of another not
liable for bonds of controlled corporation.

Bondholders of a holding corporation, which was organized for the
purpose of acquiring the stock of competing street railroad companies
and operating their properties as a unit, and which issued and sold the
bonds for that purpose, secured by mortgage on the property of such
companies, *held* to have no equity to require assumption of the bonds by
another corporation, which subsequently lawfully acquired the stock of the
holding company and continued to operate the railway lines as originally
intended, with those of other subsidiary companies, as a unitary system;
no fraud or unlawful conduct being charged.

Appeal from the District Court of the United States for the Western
District of Pennsylvania; Charles P. Orr, Judge.

Suit in equity by Benjamin C. Allen, on behalf of himself and
other bondholders of the United Traction Company of Pittsburgh,
against the Philadelphia Company, the Pittsburgh Railways Company,
and the United Traction Company of Pittsburgh. Decree for de-
fendants (265 Fed. 807), and complainant appeals. Affirmed.

George Wharton Pepper, of Philadelphia, Pa., and Thomas Patter-
son and Robert Woods Sutton, both of Pittsburgh, Pa. for appellant.

George B. Gordon and Edwin W. Smith, both of Pittsburgh, Pa.,
for appellees.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and
RELLSTAB, District Judge.

BUFFINGTON, Circuit Judge. In the court below Benjamin C.
Allen, a citizen of Colorado, filed a bill in equity on behalf of himself
and other bondholders, against the Philadelphia Company, Pittsburgh
Railways Company, and United Traction Company, all corporations
of Pennsylvania. The relief sought thereby was: (I) Discovery;
(II) that Philadelphia Company be decreed liable for accrued and to
accrue interest on the bonds of said issue; (III) that such bonds
be decreed to be an obligation of Philadelphia Company and a lien
on the property of all the defendants; and (IV) that Philadelphia
Company be enjoined from dismembering its street railway service.

To this bill the defendants duly answered. As there was vir-
tually no dispute of the basic facts on which the bill must stand,
and the plaintiff was desirous, before entering upon the labor and
expense of taking the vast amount of testimony incident to the case,
which testimony might in the end have been needlessly taken, the
plaintiff accordingly after the answers were filed, in order to have
these basic questions determined in limine and in pursuance of equity
rule 29 (198 Fed. xxvi, 115 C. C. A. xxvi) which provided, "Every

⟲⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
265 F.—52

such point of law going to the whole or a material part of cause or causes of action stated in the bill may be called up and disposed of before final hearing, at the discretion of the court," moved the court "to hear separately the points of law raised in the answers and dispose of the same before the trial of the principal case." In pursuance of this motion, the court below heard the cause, and in pursuance of an opinion reported in 265 Fed. 807, entered a decree dismissing the bill. From such decree this appeal is taken.

Without quoting the exact language of the lengthy and somewhat complicated facts set forth in the bill and answer, we shall try to state in logical order the matters and things which throw light on the basic facts from which must be drawn the warrant for the entry of the decrees prayed for in the bill:

In 1897, the traction situation in the territory in and surrounding Pittsburgh and Allegheny City may, in a general way, be stated as follows: The Second Avenue Traction, through its own lines and those of its subsidiary companies, operated the lines extending from the center of Pittsburgh up the Monongahela Valley; the North Side Traction Company, through its own lines and those of its subsidiary companies, in like manner operated to and through Allegheny City, up the Allegheny Valley; and the Pittsburgh, Allegheny & Manchester Traction Company in like manner operated to and through Allegheny City and down the Ohio Valley. Such being the situation, certain individuals formed a plan to acquire control of and thereafter consolidate those three systems, and to operate them as one. This plan of unitary acquisition, control, and operation was carried out by these men causing the United Traction Company to be incorporated by the state of Pennsylvania. In order to carry out this plan of acquisition, control, and unitary operation by the United Traction Company, that company issued, and the plaintiff, Allen, and other investors, purchased, $10,000,000 bonds of that company, which it secured by a mortgage to the Maryland Trust Company, trustee, dated July 9, 1897, upon the plants, stocks, leaseholds, and assets generally of the three above-named companies, viz. Second Avenue Traction, North Side Traction Company, and the Pittsburgh, Allegheny & Manchester Passenger Railway Company, and of their several subsidiary companies. The money raised on this mortgage was used for the purchase of such properties, the payment of underlying securities, and "$725,-000 of said bonds be reserved for betterments, improvements, and extra service." In addition to the application of the proceeds of the bonds to such purchases and to the betterment of them the men who planned this consolidation caused the United Company to issue $3,-000,000 preferred and $17,000,000 common stock. The $3,000,000 preferred stock the company sold, and used the proceeds, jointly with proceeds of the bonds, in acquiring the properties of the three Traction Companies as above stated.

It will thus be seen that the plan of unitary acquisition, control, and operation, to enable which to be carried out the plaintiff loaned his money to the United Traction Company, was duly carried out, and resulted in the unitary operation of these traction companies by

the United Traction, which was formd for such unitary operation, or, as stated in the bill:

"The properties above enumerated together constituted a complete railway system for the transportation of passengers in and through large sections of the cities of Pittsburgh and Allegheny and vicinity."

But the operations of the United Traction Company, or of those who planned it, did not stop with these operations in 1897, for in 1916 the company, or the syndicate who had organized it and held $17,000,-000 of its common stock took another step in the way of further absorption, extension into other public utilities, and broader unitary street car operation. Whether this was part of the original plan, or a later conceived one, the bill does not aver.

At that time the Philadelphia Company, the principal defendant in this case, was a large public service corporation, operating in the Pittsburgh district, either by itself or through its subsidiary companies, but in unitary control and operation, supplying to the public (a) natural gas by the Chartiers Natural Gas Company; (b) artificial gas by the Consolidated Gas Company; (c) electric light, heat, and power by the Allegheny County Light Company.

No consolidation, merger, or contract of merger or unitary operation was made with the Philadelphia Company; but the syndicate, who held the $17,000,000 common stock of the United Traction Company, bought from the individual stockholders of the Philadelphia Company the entire capital stock of that company. Having thus acquired control of the company, these new stockholders elected some of their members officers of the Philadelphia Company. Thereafter the Philadelphia Company took over the entire $17,000,000 capital stock of the United Traction Company from the syndicate, paying therefor by the issue of its own stock, and in the same way it also took over and paid for the capital stock of its three subsidiary companies, the Consolidated Gas Company, the Allegheny County Light Company, and the Chartiers Valley Gas Company. The stock of the United Traction Company, which in this way passed to the Philadelphia Company, it held until 1912, when, as hereafter stated, it passed into the hands of the Pittsburgh Railways Company. Whether the original United Syndicate who received the stock of the Philadelphia Company, continued to hold their stock, or thereafter to act in concert, the bill does not state, and that they acted at all in common, or did they act as alleged, is denied in the answer.

Thereafter the Philadelphia Company used the United Traction Company as its subsidiary, and as such subsidiary the United Company continued to operate the unitary street car system as before. Later the Philadelphia Company acquired other street railways, so that by January 1, 1902, it owned or controlled practically all the railways and traction companies operating in Pittsburgh and vicinity. At that date the Pittsburgh Railways Company, one of the defendants, was a subsidiary of the Philadelphia, and it then entered into a contract with the United Traction Company whereby it took over from the United Traction Company the unitary operation of the street car system and continued to so operate until it went into the receivership in

the court below. By that contract the Pittsburgh Company was to pay all the ordinary expenses of maintenance, and the United all the extraordinary, of the lines.

Such being a broad statement of the situation as disclosed by the untraversed averments of the bill, do they disclose a case justifying the prayers of the bill? Waiving for the present the question passed on by the court below, that the trustee of the mortgage under which plaintiff's bonds were issued is an indispensable party to the bill but was not made one, and that the bill should be dismissed on that ground, we pass to the broad underlying question whether the Philadelphia Company should be adjudged liable for the plaintiff's bonds. Before discussing that question, we note the present case is wholly different from cases of which B. & O. Tel. Co. v. Interstate Tel. Co., 54 Fed. 50, 4 C. C. A. 184, is an instance, where the holding company of the operative subsidiary company was so acting at the time the indebtedness complained of was incurred, and where there was therefore some ground for asserting that the real debt-incurring party itself impliedly invited credit, although its subsidiary operative agent made the purchase and formally obtained the credit extended.

In the present case the plaintiff loaned his money solely to the United Traction Company, and the Philadelphia Company had no connection or relation of any kind either to the plaintiff or to the United Traction Company when the plaintiff did so. Starting, then, with the foundation fact that the bonded indebtedness was contracted solely by the United Traction Company, and the credit extended was based on the security of the assets of the United Company, covered by the mortgage, it follows that the burden in the present case is upon such bondholder of the United to show that in some way the Philadelphia Company has, either (a) by a contract, express or implied, assumed responsibility for such bonds, or (b) that the Philadelphia has by some act of omission or commission, made it the duty of a chancellor to adjudge it responsible for such debt.

Moreover, this case has nothing in common with the line of cases where there was fraud, bad faith, concealment, oppression, unlawful procedure or ultra vires exertion of power and the like. In the absence of such elements which in the line of cases cited were pressed, and properly led to such decisions, the court below called attention in the extract from its opinion quoted in the margin.[1]

[1] "Having set forth the facts as they are to be found in the bill, it is well to note that the plaintiff does not 'claim fraudulent intent on the part of the officers of these companies,' and does not 'seek to recover by reason of any particular fraud,' and that it does not 'seek to recover on the ground of any improper or tortious acts committed by the officers of the Philadelphia Company and its subsidiaries.' The language in the quotations immediately preceding is the language of the learned solicitors for the complainant as found in their brief. Their contention is 'that the natural and inevitable result of the attempt of one corporation to actively operate numerous subsidiary companies, naturally competitive and with conflicting interests, was a diversion of the business of many of these companies in favor of others, and the growth of one at the expense of another.' Because of the neglect to charge fraud and the disclaimer of any right to recover upon the ground of improper or tortious acts, the court has considered a number of averments of

The bill avers no such express or implied contract, and consequently relief, if given, must rest on some act of omission or commission of that company. And in that regard it is contended that the ground for such decree is that from the acts and conduct of the Philadelphia Company in becoming the owner of the entire capital stock of the United, and thereafter by its subsidiary companies using the property of the United as its own, subjected itself to liability for the bonded indebtedness of the United. Of the fact that the Philadelphia Company, through the agencies of subsidiary companies whose stock it owned, did subsequently operate the properties which the United theretofore owned and operated, and that it operated it as a unitary system, there is no question; but this method of unitary operation, far from being wrong or unlawful, was an administrative and economic situation, which the plaintiff by his bill seeks by mandatory direction to be continued. Seeing, then, that such unitary operation of the street railways of a great city's traction lines was the plan of the United when it acquired the property of subsidiary companies, that it now seeks to have such unitary operation be continued by the Philadelphia, we are justified in presuming that the bonds in question were issued by the United, and investments were made therein by the plaintiff and other bondholders, with the expectation that the United would operate the roads and systems of the three companies whose property it absorbed. And that such original unitary operation by the United was meant in substance to be an operation by itself of its own property is shown by the fact that the leases of 900 years were, for operative purposes, to be treated as practical ownership. Indeed, this plan of unitary operation, by what was the equivalent of ownership, is further evidenced by the fact that, while the separate corporate existence of all the underlying companies of the United Traction was continued, of this very bond issue here in question of the United $4,000,000 were appropriated to the purchase of the stock of such underlying companies and $5,275,000 to paying off their bond issues.

Such being the status under which the United Traction was formed, and its bonds purchased by the plaintiff, it is apparent that the relations between the Philadelphia Company and the United Company were not created, begun, or consummated by any corporate action of the Philadelphia Company, but wholly and solely by the action of stockholders of the United Company, and that, using the stock of the United Company, the stock of the Philadelphia Company was purchased, and by such stocks so purchased the Philadelphia Company was made an instrument or agency of the United Company, or of those who controlled it, in still further extending the original plan

the bill, although in form of averments of fact, to be however but conclusions of the pleader, as, for instance, the averment in the eleventh paragraph of the bill that the Pittsburgh Railways Company holds the $17,000,000 at par value of the common stock of the United for the Philadelphia Company, and the averments elsewhere to the effect that the Philadelphia Company was operating the United Traction Company merely as an instrumentality and adjunct of its own business, and averments to the effect that the Philadelphia Company, through the Pittsburgh Railways Company, exercised control of the property of the United." etc.

of unitary operation. How this original plan of the United was further expanded and carried out appears from what has been stated heretofore, and need not be here repeated. It is not contended that the acquisition, leasing, operative merging, or operation of any or all of these companies was in itself not justified by statute. On the contrary, it is conceded they were legal, and that due corporate statutory steps were taken to effect the same. Nor is it, as we have said, contended that there was any fraud, concealment, oppression, or bad faith in carrying out and further developing the original unitary operation of the traction systems.

But the contention of the plaintiff, in substance, is that, because such unitary operation of the roads of the United's subsidiary companies was carried on by the Philadelphia Company through its subsidiary companies, and in doing so it used and mingled their properties as its own, thereby the Philadelphia Company, to follow the contention of the appellants' brief, "has effected a substantial merger or consolidation of the United and other traction companies with itself, and by reason thereof the law imposes upon it liability for the bonded indebtedness of these companies." And, as further urged in such brief, this result would follow by analogy to the—

"familiar principle of law that, when two or more corporations are consolidated by proper legal proceedings, the new consolidated corporation becomes subject to all the indebtedness and liabilities outstanding against the constituent companies at the time of the merger. This is expressly provided in this state by section 2 of the Act of May 29, 1901 (P. L. 349), and section 3 of the Act of May 3, 1909 (P. L. 408), each of which sections contains this language: 'That all rights of creditors and all liens upon the property of each of said corporations shall continue unimpaired, and the respective constituent corporations may be deemed to be in existence to preserve the same; and all debts, duties and liabilities of each of said constituent corporations shall thenceforth attach to the said new corporation, and may be enforced against it to the same extent and by the same process as if the said debts, duties and liabilities had been contracted by it.'"

We are of opinion no such legal consequence followed as a sequence to unitary operation. We are shown no decision or principle of law which warrants such result. No bad faith, fraud, or absence of good faith is asserted. The creation and operation of this unitary system was in pursuance of statutory power, and just such an operation as the parties contemplated when this plaintiff loaned his money to aid in carrying out a well-understood course. In carrying out the general course, it will be noted the United Traction Company had no property of its own and contributed none to the unitary system. It, too, was solely a holding company, having leaseholds, stocks, and bonds of subsidiary companies, which items were covered by the mortgage by which the plaintiff's bonds were secured and on which alone he had a lien. Now, these items still remain, are still covered by the mortgage, and, in so far as they are of value, are still held for the benefit of the mortgage bondholders. The substantial complaint of the bondholder is not that his security has been taken away, but that the unitary operation which he contemplated and intended has not proved profitable. For it is apparent that, when the plaintiff invested in his

bonds, a security such as this, based as it was on the profits then realized on such consolidation of street railways into a unitary system, was regarded as of high financial worth, but with increased operative, labor, and material costs, and without ability to raise their car fares, and with the general disfavor of the public toward street railway systems everywhere, have deteriorated as financial securities. We see no ground for holding the Philadelphia Company responsible for this outcome to the bondholder, who still has a lien on the mortgaged property, but which seemingly is not of the financial value it originally had.

The Court below committed no error in dismissing the bill.

RELLSTAB, District Judge. I concur in the opinion that the bill was properly dismissed, but solely on the ground of the lack of an indispensable party plaintiff.

The bill charges equitable waste of a mortgage given to secure an issue of bonds, of which the plaintiff owns but a small part. The mortgage was not made to the plaintiff, but to a trustee. In my opinion, no one but the mortgagee has sufficient standing to prevent the wasting of the security or to proceed against the waster, and that this court should refrain from passing upon the issues tendered by the bill until presented by the trustee, or the latter shall on request of a bondholder decline so to do.