**JAMES E. McFADDEN, INC.**

v.

**BALTIMORE CONTRACTORS, INC., et al.**

Civ. A. No. 83–1905.

United States District Court, E.D. Pennsylvania.

May 1, 1985.

Barbara L. Farley, Philadelphia, Pa., for James E. McFadden, Inc.

Jeanne Ward Ryan, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for United States Fidelity & Guaranty Co.

## MEMORANDUM

GILES, District Judge.

James E. McFadden, Inc. ("McFadden") brought this diversity action against several defendants to recover monies allegedly due it for construction work performed as a subcontractor at the Limerick Generating Station Project. Named as the principal defendants were Bechtel Power Corporation ("Bechtel"), the general contractor, Baltimore Contractors, Inc. ("Baltimore"), the contractor with whom McFadden entered into the subcontract agreement, and United States Fidelity and Guaranty Company ("USF & G"), a bonding company. A default judgment was entered against Baltimore in July, 1983. Summary judgment was entered in favor of Bechtel in May, 1984. Thus, the only remaining defendant at this juncture is USF & G.[1] USF & G did not bond Baltimore on the Limerick job. However, McFadden has proceeded against USF & G on a theory that USF & G took control of Baltimore in 1980. Under plaintiff's theory, Baltimore was a mere instrumentality of USF & G and therefore USF & G should be held liable for the debts of Baltimore. USF & G has filed a motion for summary judgment arguing that the undisputed material facts show that Baltimore was not the instrumentality of USF & G. For the reasons which follow, USF & G's motion shall be granted.

## FACTS

USF & G bonded Baltimore for numerous construction projects. However, the Limerick project, on which McFadden worked, was not one of them. Baltimore began experiencing severe financial difficulties in 1979–80 because of a loss it incurred on one of its major projects. During this time, Baltimore and its affiliated company, the Empire Construction Company, had USF & G bonded jobs in various stages of completion, having an aggregate contract amount of $142,000,000. USF & G stood to lose up to $50,000,000 in excess of the remaining contract payments, liquidated damages and claims if it took over the jobs and completed them for Baltimore. In order to minimize its risks, USF & G entered into a Supplemental Agreement with Baltimore on April 22, 1980.

Under this Agreement, USF & G loaned about $20,000,000 to Baltimore to fund Baltimore's continued operation and the completion of bonded jobs. The agreement contained many conditions that had to be met by Baltimore. It also provided that failure to comply with these conditions could result in USF & G's terminating further bonding and/or foreclosure. Some of these conditions were:

1. Transferring to USF & G all funds paid to Baltimore under various construction contracts bonded by USF & G.

2. Turning over all profits from any joint venture to USF & G to be applied to reduce the line of credit.

3. Promptly paying all sums due and owing for labor in a manner acceptable to USF & G.

4. Furnishing USF & G with documentation justifying overhead expenses upon requesting USF & G to pay such expenses.

5. Allowing USF & G to pay directly for suppliers' claims or take whatever action necessary to settle such claims upon Baltimore's failure to pay them.

6. Allowing USF & G to complete projects it had bonded in Baltimore's name and at Baltimore's expense if Baltimore failed to complete them.

7. Providing USF & G prompt access to all project sites bonded by it and to Baltimore's books, records and other job accounts.

8. Installing an accounting system satisfactory to USF & G and providing monthly financial statements to USF & G.

9. Assigning collateral, listed in an attachment to the agreement, to USF & G.

1. The other defendants, BCI Contractors, Inc., Victor Frenkil and BCI Huarte & CIA, S.A., were dismissed per stipulation between the parties.

10. Providing that USF & G was the holder in due course of certain promissory notes made by Baltimore.

11. Authorizing USF & G to give instructions to subcontractors, suppliers, etc. necessary in USF & G's opinion to effectuate the provisions of the agreement.

12. Risking foreclosure if it failed to cooperate in the completion of construction contracts bonded by USF & G or attempted to commence bankruptcy proceedings.

13. Promising not to enter into any new construction contracts except cost plus contracts not in excess of $100,000, make any loans or any investments, purchase any real estate, etc.

14. With respect to unbonded work—providing a monthly accounting to USF & G and holding all funds received from unbonded work in trust to (a) pay for labor and materials, etc. used in completing unbonded work, (b) pay for indirect overhead incurred in unbonded work and (c) pay USF & G as a credit against advances made by USF & G for work bonded by it after all existing unbonded work was completed.

### Summary Judgment Standard

Summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56; *Hollinger v. Wagner Mining Equipment Co.*, 667 F.2d 402, 405 (3d Cir.1981). *See also Continental Insurance Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir.1982). Any doubts as to the existence of a genuine issue of fact and any inferences drawn from the evidence submitted must be resolved in favor of the party opposing the motion. *Continental Ins. Co.*, 682 F.2d at 438, *quoting Hollinger*, 667 F.2d at 405 (other citations omitted). Although summary judgment has been " [c]haracterized as both a 'drastic' and 'extreme' remedy," it should be granted when doing so would " 'avoid waste of time and resources of both the litigants and the Court where trial would be a useless formality.' " *Associated Film Distribution Corp. v. Thornburgh*, 520 F.Supp. 971, 977 (E.D.Pa.1981), *quoting Hollinger v. Wagner Mining Equipment Corp.*, 505 F.Supp. 894, 896–98 (E.D.Pa.1981).

### DISCUSSION

■ There is no dispute that USF & G loaned Baltimore $20,000,000 which was memorialized in a Supplemental Agreement that made certain requirements regarding the securing of this loan and the completion of projects bonded by USF & G. There is a dispute whether by imposing these requirements, USF & G took total and actual control over Baltimore, rendering it USF & G's instrumentality. This dispute is a question of law to be decided by this court. The instrumentality theory has been most thoroughly discussed by the Fifth Circuit in *Krivo Industrial Supply Co. v. National Distillers and Chemical Corp.*, 483 F.2d 1098 (5th Cir.1973), *modified*, 490 F.2d 916 (5th Cir.1974).[2] To es-

---

**2.** Instrumentality is a concept basically routed in state law. The controversy in *Krivo* involved a corporation whose principal place of business was Alabama. Consequently the Fifth Circuit looked principally to Alabama law. However, its discussion of instrumentality was a general one which examined several other states' treatment of the concept. Here, both Baltimore and USF & G are Maryland corporations authorized to do business in Pennsylvania. McFadden is a Pennsylvania corporation. The Limerick project was located in Pennsylvania. Pennsylvania and Maryland have both applied or considered the appropriateness of applying the in-

strumentality theory, although not necessarily to the same fact scenario as the one here. *See Baltimore & O. Tel. Co. of Baltimore County v. Interstate Tel. Co.*, 54 F. 50 (4th Cir.1893); *E.C. Ernst, Inc., et al. v. Baltimore Contractors, Inc., et al.*, No. 81–3887 (E.D.Pa. Aug. 4, 1983); *Allen v. Philadelphia Co.*, 265 F. 807 (W.D.Pa.1919), *aff'd*, 265 F. 817 (3d Cir.1920); *Botwinick v. Credit Exchange, Inc.*, 419 Pa. 65, 213 A.2d 349 (1965); *Rumig v. Ripley Manufacturing Corp.*, 366 Pa. 343, 77 A.2d 360 (1951); *Ambridge Borough v. Philadelphia Co.*, 283 Pa. 5, 129 A. 67 (1925). Thus reliance on *Krivo* is appropriate.

tablish liability under an instrumentality theory, "[f]irst, the dominant corporation must have controlled the subservient corporation, and second, the dominant corporation must have proximately caused plaintiff harm through misuse of this control." *Krivo*, 483 F.2d at 1103. Generally, "the mere loan of money by one corporation to another does not automatically make the lender liable for the acts and omissions of the borrower." *Id.* at 1104 (citations omitted). However, if the "lender becomes so involved with its debtor that it is in fact actively managing the debtor's affairs, then the quantum of control necessary to support liability under the 'instrumentality' theory may be achieved." *Id.* at 1105. A "strong showing" is required to establish "actual, participating [and] total control of the debtor" by the creditor. *Id.* Taking "an active part in the management" does not alone constitute control under the instrumentality theory. *Id.* For example, in *Chicago Mill & Lumber Co. v. Boatmen's Bank*, 234 F. 41 (8th Cir.1916), the court held that there was no total and actual control where the creditor corporation elected one of its officers or employees as president of the debtor corporation who then along with the president of the creditor corporation gave directions to the debtor corporation. In those cases where liability has been applied under an instrumentality theory, the debtor or subservient corporation had, in reality, no separate corporate purpose from that of the creditor or dominant corporation. *Krivo, supra,* 483 F.2d at 1105; *E.C. Ernst, Inc. v. Baltimore Contractors, Inc.*, No. 81–3887, slip op. at 5 (E.D.Pa. Aug. 4, 1983). *See Edwards Co., Inc. v. Monogram Industries, Inc.*,

700 F.2d 994 (5th Cir.1983); *Baltimore & O. Tel. Co. of Baltimore County v. Interstate Tel. Co.*, 54 F. 50 (4th Cir.1893).

■ Here, the evidence taken in the light most favorable to plaintiff shows not that USF & G took absolute and total control of Baltimore, but rather that it took steps to minimize its risks as a major creditor of Baltimore. The Supplemental Agreement by which USF & G loaned the additional $20,000,000 to Baltimore spells out the terms of the loan. It does not transfer total control of Baltimore Contractors to USF & G.[3]

Plaintiff points to several sections of the Supplemental Agreement as evidence of domination by USF & G of Baltimore. It calls attention to (1) the requirement that Baltimore assign to USF & G all funds remaining to be paid to Baltimore under various construction contracts bonded by USF & G including payments for work already performed and materials supplied and payments for future work and materials (Supplemental Agreement ¶ 1) and (2) the agreement that "all funds received from the aforesaid construction contracts, including claims for damages and extra work claims against obligees" were to be paid to USF & G "in the manner designated by USF & G." (Supplemental Agreement ¶ 2(a) ). With respect to the requirements of paragraph 2, however, plaintiff fails to mention that these funds were to be placed in a trust by USF & G to be applied

first toward the reimbursement of USF & G for any payments made by it to persons supplying labor and/or materials in the prosecution of the work, second

---

3. Plaintiff relies on the decision in *E.C. Ernst, supra,* for the proposition that a material issue of fact exists and the case should be allowed to go to trial. In *E.C. Ernst,* the plaintiff, like McFadden, was a subcontractor on a project on which Baltimore was the general contractor. E.C. Ernst had brought USF & G into the action as a defendant charging, in effect, that USF & G had taken control over Baltimore and had thereby fraudulently deprived plaintiff of payment. USF & G's motion for summary judgment was denied because the court believed "[t]he issue of whether BCI became a mere instrumentality of

USF & G is best determined on a fully developed factual record at trial." *E.C. Ernst, supra,* slip op. at 7. However, after the record was more fully developed at trial, the court granted USF & G's motion for a directed verdict. Although this outcome in favor of USF & G in *E.C. Ernst* cannot be given res judicata or collateral estoppel effect, because McFadden was not a party to that action, it does serve to bolster this court's finding that there has been and can be no showing that USF & G made Baltimore its mere instrumentality.

for any funds advanced or loaned to PRINCIPALS pursuant to this Agreement, third for all other loss, costs and expenses it has incurred in the discharge of its duties as surety on said BONDS, and fourth to interest on funds advanced or loaned to PRINCIPALS pursuant to this Agreement.

Supplemental Agreement, ¶ 2(a). These requirements were imposed by USF & G to insure payment on the loan and do not manifest total and actual control over Baltimore.

Paragraphs 3(a) and (b) of the Agreement required Baltimore to seek USF & G's approval for all payments advanced for labor, materials, overhead, insurance premiums, taxes, attorney's fees and consultant's fees and USF & G could withhold payment if it did not approve of the payment. These requirements must be read with the introduction to paragraph 3(a) of the agreement in mind. It reads:

> Prompt payment of all sums due and owing by PRINCIPALS for labor, including to their own employees working in the field, and for materials furnished to PRINCIPALS for use in the prosecution of the work on all construction contracts bonded by USF & G, is the essence of this agreement, and PRINCIPALS agree that they will proceed promptly to pay said accounts and shall not arbitrarily or capriciously delay in paying them.

Reading the paragraphs in question in conjunction with the introduction shows that the requirements contained therein were a means of insuring that Baltimore used the funds loaned to it by USF & G for completing the bonded jobs only.

In paragraph 7(a), Baltimore agreed to assign to USF & G stocks, real estate, other securities, life insurance policies and other assets. Plaintiff states that the collateral assigned to USF & G "far exceeded the value of the $20,000,000" loaned. Although the collateral listed in the Agreement appears to be substantial, no dollar amount has been affixed to it. Assuming the value of the collateral is relevant, it is incumbent upon plaintiff in opposing this summary judgment motion to put forth evidence as to the relevance and value of the collateral. It is unclear what significance the amount of collateral plays in proving that Baltimore was USF & G's instrumentality especially since USF & G would obtain legal ownership in the collateral only upon Baltimore's default.

USF & G agreed, in paragraph 10, not to demand payment of interest or principal prior to the expiration of thirty-six months from February 29, 1980 if: (1) Baltimore cooperated fully with USF & G in completing all construction contracts, defending all litigation involving contracts bonded by USF & G and in recovering USF & G's advance of funds; (2) Baltimore did not "attempt to commence any federal bankruptcy proceedings, avail themselves of any state insolvency law ... or permit [itself] to be adjudicated insolvent or bankrupt;" and (3) Baltimore did not permit assets securing the "Promissory Note to be sold, assigned or otherwise disposed without the written consent of USF & G, or further encumbered by any subsequent security interest," or the like. Plaintiff characterizes this paragraph as forcing Baltimore to give up the right to declare bankruptcy. However, this paragraph provided that Baltimore would not have to begin repayment of its loan for a period of three years unless it attempted to go into bankruptcy or do one of the other activities listed in that paragraph. Given that USF & G was the creditor, it clearly had the right to make a reasonable demand for repayment. An attempt by Baltimore to avoid repaying its loan by declaring bankruptcy or an attempt to sell assets marked as collateral for USF & G provide reasonable cause for USF & G to demand repayment by Baltimore.

Plaintiff also focuses the court's attention on paragraph 10(b)(1) in which USF & G conditioned, among other things, Baltimore's entering into any new construction contracts in excess of $100,000 on obtaining USF & G's written consent. Failure to obtain this consent could result in foreclosure proceedings. Again, this provision

is indicative of USF & G's desire to minimize its risk. Should Baltimore enter into any new contracts and fall further into debt, USF & G's risk would have been that much greater.

■ With respect to the unbonded jobs, plaintiff emphasizes that in paragraph 14 of the Agreement, USF & G required Baltimore to (1) furnish a monthly accounting, (2) hold all funds received from unbonded work in trust and use them to pay (a) for the labor and material costs and the costs of taxes and insurance incurred in completing unbonded work, (b) for the indirect overhead incurred for unbonded work and (c) USF & G as a credit against advances made by USF & G on the bonded work after all of the unbonded work is completed. Furnishing USF & G with a monthly accounting of the unbonded jobs does not amount to Baltimore's relinquishing control over them. Rather, it is evidence that USF & G wanted to monitor Baltimore's accounts. Moreover, the inclusion of a provision in the Supplemental Agreement to insure that Baltimore pay labor, material and other costs on unbonded jobs undercuts plaintiff's theory that USF & G took control over Baltimore "to keep Baltimore going long enough to complete its bonded obligations and settle as many claims as possible before USF & G pulled the financial plug on Baltimore." Essential to establishing liability under an instrumentality theory is showing that "fraud or injustice proximately result[ed] from a misuse of this [actual and total] control by the dominant corporation." *Krivo, supra,* 483 F.2d at 1106. It is true that actual fraud need not be shown and "courts may decline to recognize corporate existence whenever recognition of the corporate form would extend the principle of incorporation 'beyond its legitimate purposes and [would] produce injustices or inequitable consequences.'" *Id.* at 1106, *quoting, Forest Hill Corp. v. Latter & Blum, Inc.,* 249 Ala. 23, 29 So.2d 298 (1947). Nevertheless, it cannot be said that USF & G's attempts to insure that Baltimore fulfill its obligations on its unbonded jobs, which may have included the Limerick project, produced "injustices or inequitable consequences" to plaintiff.

As part of the Agreement, an irrevocable power of attorney was given to USF & G employees, Ray Britt, Ronald Wohlust and Steven Trecker. This power of attorney allowed USF & G to insure the completion of work bonded by it. Nothing empowers the USF & G employees to control Baltimore's activities or management decisions with respect to Baltimore's unbonded projects or to any projects Baltimore may have had that were bonded by sureties other than USF & G.

Contrary to plaintiff's contentions, total control over Baltimore by USF & G is not evidenced by the lack of a scheduled repayment plan. The Supplement Agreement did provide that Baltimore had three years before it would have to begin repayment. In addition, the Agreement was replete with provisions requiring Baltimore to put funds in trust which would go towards payment to USF & G after other obligations had been fulfilled.

Plaintiff attached several letters and USF & G internal memoranda in its opposition to USF & G's motion for summary judgment from which this court is to draw the inference that USF & G was controlling the hiring at Baltimore and that USF & G was secretly controlling Baltimore in general. However, plaintiff's interpretation of this correspondence greatly exaggerates USF & G's power over Baltimore. In fact, this correspondence reveals that Baltimore retained its management powers. For example, Victor Frenkil, Chief Executive Officer of Baltimore, wrote to the vice president of USF & G: "You have also been made privy to the substantive changes we have made in our organization.... We feel confident that these changes are in the best interest of our Company." Plaintiff's Memorandum in Opposition to the Motion for Summary Judgment, Exhibit F. Thus it appears that it was Baltimore that was responsible for the organizational changes made within the company. These changes may have been subject to review by USF &

G but there is no evidence from which it can be inferred that they occurred under USF & G's control. In this same letter Mr. Frenkil complained that, "[u]nless we are given immediate authority to start bidding work, we will be forced out of business." Rather than showing control of Baltimore by USF & G, this plea evidences an attempt by Mr. Frenkil to modify the Supplemental Agreement which had in part conditioned Baltimore's receiving the $20,000,000 loan on its not accepting any more construction projects worth over $100,000. This condition appears a reasonable method of insuring that Baltimore would spend its efforts and resources completing the jobs bonded by USF & G rather than taking on new projects and perhaps finding itself further in debt.

■ Plaintiff also makes much of USF & G's refusal to consider requests by Baltimore for the bonding of new contracts until Baltimore had " 'on board' a new Chief Executive Officer." Plaintiff's Exhibit G. However, USF & G made it clear that Mr. Frenkil would be selecting the new officer, not USF & G. USF & G added that if it was "to consider bonds for Baltimore Contractors, Inc. and its subsidiaries, [it] must have confidence in the new Chief Executive Officer." Plaintiff's Exhibit G. This notification is not indicative of control nor is it unusual. Given Baltimore's precarious financial situation, conditioning bonding for future projects on confidence in the new chief executive officer was a justifiable position for USF & G to take.[4] Thus, as in *Krivo*, any control being exercised over

Baltimore's personnel decisions, was by virtue of USF & G's power to bond or not bond future projects. *See Krivo, supra,* 483 F.2d at 1110. This type of control is too tangential to be characterized as actual and total.

As further evidence of USF & G's control, plaintiff points to a letter in which USF & G more or less demanded to be kept informed of joint ventures entered into by Baltimore—especially those where the joint venturer was not going to accept full responsibility for bonding and financing. Plaintiff's Exhibit J. This letter evidences a concern on the part of USF & G that it may have to bond any such projects. Given this potential responsibility, it undoubtedly wanted to be involved in the negotiations from the very beginning. Thus once again, the letter relied upon by plaintiff merely evidences USF & G's attempts to lessen its risks with respect to bonded projects, not an attempt to assume total and actual control over Baltimore.

Mr. Frenkil's opinion that USF & G's president and chairman of the board could "with the bend of [his] little finger ... pull B/C out of this tailspin" is nothing more than unsubstantiated opinion and does not suffice as evidence of total control by USF & G of Baltimore. Nor does James McFadden's affidavit, in which he states Mr. Frenkil told him: "Don't let a bonding company take you over like USF & G took us over." This statement amounts to nothing more than hearsay.

Largely irrelevant to the issue whether USF & G had taken total control over Balti-

4. Further evidence of USF & G's lack of involvement in Baltimore's personnel decisions is found in Mr. Frenkil's letter to Ronald Wohlust, Assistant Vice President at USF & G. Plaintiff's Exhibit H. In this letter, Mr. Frenkil expressed dismay that the hiring of a particular individual "would not result automatically in bonding for B/C Inc., but that all requests for bonding would be decided on the basis of the particular job and the status of B/C at the time of our application." This passage, with the other evidence in the record, tends to show that USF & G felt that if Mr. Frenkil continued as Baltimore's chief executive officer, the risk would be too great to justify USF & G's bonding future projects. It also appears that there were two

people considered to replace Mr. Frenkil in whom USF & G had more confidence. However, there was no promise that their being hired would result in immediate bonding. Rather, the bonding of projects would depend on the project to be bonded and on the overall financial status of Baltimore. Apparently there was some discussion to the effect that if another individual being considered for the chief executive officer position was hired, USF & G would guarantee his contract. During an interview with this individual, USF & G promised to provide bonding worth $25 million to Baltimore. For reasons not made clear in the record, this individual's name was withdrawn as a candidate.

more are two USF & G interoffice memoranda written during or after the time that USF & G foreclosed on Baltimore. Plaintiff cites these memoranda to refute USF & G's claim that it "was always above board and that no activities were intentionally withheld from the general public." In the first memorandum, Mr. Wohlust informed USF & G's president and chief operating officer that USF & G was moving quickly toward foreclosure on assets of Baltimore and that notices would be published in two weeks regarding the sale by trustees. Prior to this publication, USF & G wanted to keep the foreclosure from the media. Reading further it appears that USF & G wanted this two week period in order to prepare an accurate statement to be released to the entire press at the same time. The desire to have an accurate statement for release appears reasonable inasmuch as Baltimore was a major employer and its demise was undoubtedly a newsworthy event. The second memorandum discusses the route USF & G should take in settling or litigating claims by subcontractors against Baltimore. Mr. Wohlust noted that: "If the full extent of BCI's financial weakness becomes known, the subs will 'train their guns' on us. We are a more attractive, less defensible target, and settlement values will rise." It can be inferred from this statement that USF & G was again taking steps to minimize its losses.

Taken separately or together, the provisions of the Supplemental Agreement and the other evidence in the record show that as in *Krivo*, the control exercised over Baltimore by USF & G was nothing more than USF & G's ability to decide whether to continue extending the loan and when to demand its repayment. The Agreement put Baltimore on notice as to which of its activities were likely to result in acceleration or foreclosure. Moreover, there has been no showing of fraud on the part of USF & G. Consequently, there is no evidence that USF & G took total and actual control over Baltimore and plaintiff's mere instrumentality must fail.

An appropriate order follows.

ORDER

AND NOW, this 1st day of May, 1985, for the reasons stated in the accompanying memorandum, it is hereby ORDERED that United States Fidelity and Guaranty Company's motion for summary judgment is GRANTED.