Thomas PEARSON, John Kowalski and on behalf of themselves and all other similarly situated, Plaintiffs,

v.

COMPONENT TECHNOLOGY CORPORATION, a/k/a Comptech, a corporation, General Electric Capital Corporation, a corporation, and TIFD VII–R, Inc., a corporation, Defendants.

No. Civ.A.94–293 ERIE.

United States District Court, W.D. Pennsylvania.

Dec. 16, 1999.

Joseph M. Ludwig, Rolf Louis Patberg, Ludwig, Patberg, Dixon & Ging, Pittsburgh, PA, Richard E. Filippi, Filippi & Nies, Erie, PA, for plaintiffs.

Richard A. Lanzillo, Knox, McLaughlin, Gornall & Sennett, Erie, PA, Thomas A. Roberts, Daniel S. Reinberg, Jonathan D. Lotsoff, Sidley & Austin, Chicago, IL, for defendants.

Richard J. Parks, MacDonald, Illig, Jones & Britton, Erie, PA, for Richard Parks, movant.

Thomas P. Agresti, Agresti & Agresti, Erie, PA, for Thomas P. Agresti, trustee.

Kenneth Chestek, Agresti & Agresti Erie, PA, pro se.

## OPINION

COHILL, Senior District Judge.

This class action is one of several pieces of litigation resulting from the closure of the Component Technology Corporation plant ("Comptech") in Millcreek, Pennsylvania on October 14, 1994. The plaintiff class alleges that defendants General Electric Capital Corporation ("GE Capital"), and its subsidiary, TIFD VII–R Inc. ("TIFD"), (collectively "the GE Capital defendants"), had a duty to provide Comptech's employees with a sixty day notice of the closing as required by the Worker Adjustment Retraining Notification Act, 29 U.S.C. § 2101, et seq. ("the WARN Act").[1]

The GE Capital defendants deny liability, asserting that they were not employers within the meaning of the WARN Act, and did not function as Comptech's parent or alter-ego. GE Capital maintains that at all times it was acting only in its capacity as a secured lender.

Before the Court are motions for summary judgment filed by the defendants (Doc. 84), and for partial summary judgment on the issue of liability by the plaintiff class (Doc. 93). Disposition of these motions requires that we determine whether, and under what circumstances, a lender may be considered an employer for purposes of liability under the WARN Act, which are questions of first impression in this circuit.

For the reasons set forth below, we will deny the plaintiffs' motion and grant summary judgment in favor of the defendants.

### I. Factual Background

Comptech, a Delaware corporation with its headquarters in Erie, Pennsylvania, was in the business of designing custom injection molds and assembling precision plastic parts for business machines. GE Capital's involvement with Comptech began in June of 1989, when it entered into a loan agreement with Chicago Plastic Products Corporation ("Chicago Plastics"), Comptech, and Comptech's wholly-owned subsidiary, R & R Plastics Corporation ("R & R Plastics") (collectively "the borrowers"). The loan was evaluated and approved by the Chicago office of GE Capital's Corporate Investment Financing division, and was used to finance Chicago Plastic's acquisition of Comptech and R & R Plastics. Pls.' Ex. 77.

As security for a loan of approximately $25,000,000, GE Capital received pledge agreements from the borrowers' share-

---

1. By Order dated May 30, 1995, the Court entered a default judgment against defendant Comptech, which is currently in bankruptcy.

holders for all of the borrowers' stock, which included the right to vote that stock in the event of a default.

Chicago Plastics was in default by mid-1990, and GE Capital notified Chicago Plastics that these defaults would not be waived. On July 10, 1991, GE Capital declared that Chicago Plastics' obligations were due and owing, and exercised its rights under the loan agreement to vote the borrowers' stock. In accordance with that agreement, GE Capital replaced the board of directors of each borrower, and the new boards elected officers. Thomas Gaffney was elected to head Comptech's new management team as CEO and chairman of the new board of directors. Gaffney, who had extensive experience in the plastics industry, was hired pursuant to a consulting agreement. Pls.' Ex. 13. Gaffney appointed Richard H. Brooks, who was already serving as Comptech's executive vice-president, to serve as the company's president.

GE Capital also took an additional step on July 10, 1991 to secure its investment. Concerned that Comptech's former board of directors would initiate bankruptcy or receivership proceedings, the lender filed a motion for a temporary restraining order in the United States District Court for the Northern District of Illinois (Civil Action No. 91–C–4291). That court granted GE Capital's motion, and enjoined Comptech from filing for bankruptcy or receivership. Pls.' Ex. 162.

Beginning in late 1991 or early 1992, Jeanette Chen began to manage the Comptech account for GE Capital. Chen. Aff. at ¶ 5. At that time, Chen was a vice president in the portfolio group at GE Capital, and was responsible for monitoring numerous accounts. Chen Aff. at ¶ 4. In March of 1992, Chen wrote an internal credit memorandum which explained the history of GE Capital's loans to Comptech, and proposed restructuring the account. Pls.' Ex. 2. Chen's memorandum included a proposed merger and acquisition strategy, which she believed would help to expand Comptech's customer base and enhance its profitability. Pls.' Ex. 2.

In March of 1992, as outlined in Chen's memo, GE Capital restructured its loans. The lender wrote off in excess of $20,000,000 of Comptech's debt obligations, and restructured the remaining debt as three term loans, a revolving line of credit, and preferred stock. As security for its loans, under the reorganization GE Capital received 4000 shares of preferred stock, had a 100% pledge of Comptech stock, and had the right to take control of the Board of Directors after two dividend payments were missed.

The terms of the agreement ("the Loan Agreement")[2] include a number of provisions which were designed to protect GE Capital's investment. Most germane to the issues before us, under the "Negative Covenants" set forth in Section 7, the lender's approval was required before Comptech or a subsidiary could enter into any of the following transactions: merging with or acquiring another company; investing or making loans; incurring additional indebtedness; selling or transferring properties encumbered by the liens which secured GE Capital's loans, in excess of $50,000 aggregate value per year; changing the company's capital structure; creating any new liens on secured property or assets; making capital expenditures in excess of an annual approved amount; or paying annual compensation in excess of $100,000, except to certain employees. Pls.' Ex. 100 at 65–71.

---

**2.** During the course of the relationship between GE Capital and Comptech, the loan agreement between the parties was modified several times in ways that, unless noted herein, have no bearing on our decision here. The parties have provided us with the Amend-ed and Restated Loan Agreement dated June 5, 1992 (Pls.' Ex. 100, Defs.' Ex. 1), and we will refer to this agreement as the Loan Agreement throughout this opinion and make citations to it.

The Loan Agreement also defined events of default, and provided that, in the event of a default, the lender could terminate any further revolving credit advances, and declare all outstanding obligations due and payable. Pls.' Ex. 100 at 76.

Thomas Gaffney's consulting contract was renewed, and he was again indemnified from liability as a shareholder and as chairman of the board of directors. Pls.' Ex. 11. Gaffney and Brooks purchased all of Comptech's common stock. On March 31, the Amended and Restated Certificate of Incorporation for Comptech, a Delaware corporation, was recorded. Pls.' Ex. 45.

Comptech made arrangements to acquire Accu–Form, Inc. ("Accu–Form"), a plastic injection molder specializing in medical, pharmaceutical, and electronic parts. Comptech, R & R Plastics, Accu–Form, and Frances W. Czulewicz, who was Accu–Form's sole shareholder and CEO, entered an Acquisition Agreement, in which the parties agreed that Accu–Form and R & R Plastics would merge. Pls.' Ex. 146.

Since GE Capital held a security interest in R & R Plastics, the lender had to approve that merger. An Amended and Restated Loan Agreement was entered on June 5, 1992, which essentially acknowledged that R & R Plastics and Accu–Form had merged, and that Accu–Form was replacing R & R Plastics as a party in the loan documents. The amended agreement gave GE Capital a security interest in Accu–Form to secure R & R's indebtedness. Pls.' Ex. 100.

With the new Loan Agreement in place, Comptech continued designing and marketing injection molds and GE Capital provided funding to finance the plant's operation. GE Capital, and particularly Jeanette Chen, closely monitored the Comptech account, and there is an extensive record of correspondence between the lender and borrower. On occasion, GE Capital made decisions to extend financing even though no payments had been made, and waived penalty interest on the unpaid loans. *See e.g.* Pls.' Ex. 8, 10. In accordance with the Loan Agreement, Comptech frequently had to request that the lender assent to certain business plans and arrangements where those plans would affect GE Capital's security interest.

In the fall of 1993, Comptech created a new subsidiary, Comptech de Mexico, S.A. de C.V. ("Comptech de Mexico") at the suggestion of one of its major customers, Mars Electronics, which was moving its manufacturing facility to Mexico. Mars agreed to provide start-up financing for the company, and Comptech negotiated with Mexican financial institutions regarding a loan for working capital. In addition, Comptech provided certain equipment to the venture. Comptech also negotiated the purchase of Phoenix International, a Mexican company, in connection with Comptech de Mexico. Pls.' Ex. 147.

Since the Loan Agreement required GE Capital's assent before Comptech could transfer any equipment in which the lender held a security interest, or before it could create a subsidiary corporation, GE Capital's assent was necessary before the Comptech de Mexico plan could be implemented. An amendment to the Loan Agreement was executed on November 23, 1993. Pls.' Ex. 153. In that document, the circumstances of Comptech de Mexico's creation were set forth, and GE Capital agreed to release its security interest in the equipment and to waive or amend certain provisions of the Loan Agreement. Comptech held 85% of its new subsidiary's stock, and pledged those shares to GE Capital as security on its loan. Pls.' Ex. 132.

In January of 1994, Comptech negotiated the sale of the remaining assets of its subsidiary, R & R Plastics, to Fulton Industries, and used the proceeds to prepay its term debt to GE Capital in accordance with prepayment provisions of the Loan Agreement. Pls.' Ex. 104.

Comptech continued to explore ways to expand its customer base and to reduce its

operating expenses. For example, it proposed consolidating Comptech's and Accu-Form's manufacturing operations in a single new building. In developing this plan, Comptech negotiated with the companies' existing landlords, as well as with contractors for bids on a new facility. Pls.' Ex. 155. At times, the company also made decisions to update its equipment. In one instance, Comptech purchased new grinding and molding equipment, which was financed by USL Capital, another lender. Pls.' Ex. 134.

In the spring of 1994, Gaffney, acting as chairman of the board, fired Brooks as Comptech's president and replaced him with Charles V. Villa. On May 16, 1994, Villa sent Chen a detailed update on Comptech's business plans, and asked for additional funds to cover operational losses and to finance new equipment. Pls.' Ex. 7.

In June of 1994, Gaffney and Brooks sold all of their Comptech stock to Villa, and Gaffney resigned. GE Capital had a call on all of Villa's shares of Comptech stock.

By late summer, it appears that Comptech was at least contemplating that the plant might have to be closed. Comptech asked its attorneys for advice as to whether it had an obligation to provide notice to the plant's employees before closing the facility. In a memo dated August 29, 1994, Comptech's attorney advised that, as the employer, Comptech would be obligated to give sixty days notice under the WARN Act. Pls.' Ex. 16.

On September 24, 1994, Comptech and Accu-Form notified GE Capital that they needed an additional $2 million in working capital in order to continue operations for the remainder of 1994. Pls.' Ex. 21. They were informed that the lender would not provide further funds. In an internal memo dated September 30, 1994, Chen recommended that GE Capital liquidate Comptech's assets as partial payment on the outstanding loans. Pls.' Ex. 4.

Comptech was also seeking financing from other sources, and Villa had discussions with CitiBank Venture Capital Limited regarding securing the $2 million needed to continue to operate Comptech through 1994.

In a letter to Ed Christie, GE Capital's senior vice president of Portfolio Development and Support, Comptech's sales director, Henry Makie, pleaded with the lender to continue to provide financing, and stated that "our management is working to complete a transfer sale to another financial entity." Pls.' Ex. 36. However, GE Capital decided not to extend further credit, and to accept Comptech's liquidated assets as collateral on unpaid loans. By early October, the outstanding principal balance on Comptech's loans was $6,650,-000. Pls.' Ex. 24.

TIFD VIII-R was incorporated to conduct the liquidation, and GE Capital assigned its rights in the collateral to TIFD. Pls.' Ex. 113. Negotiations ensued between counsel for the creditor and counsel for Comptech, and drafts of the proposed agreements were circulated on October 11 and 12, 1994. These documents were drafted in accordance with Pennsylvania UCC § 9-505(b). They included an Asset Turnover Agreement, Pls.' Ex. 160, an Asset Retention and Purchase Agreement, and a Supplemental Funding Agreement to fund the wind-up costs, including accrued employee wages and benefits. The agreements were signed on October 13, 1994.

On October 14, Comptech's employees learned that the plant was closing, effective immediately, when Charles Villa posted the closing notice. Pls.' Ex. 50. Paragraph 6 of the notice gave this explanation of the closing:

6. The unexpected temporary separation occurred on October 13, 1994 when General Electric Credit Corporation refused to extend additional financing to Component Technology Corp. ("Company") and withdrew current funds. Since the unexpected temporary closing yes-

terday, it has become apparent that the Company will not be financially able to reopen and that the closing will most likely be permanent. This notice was not provided sixty (60) days prior to the plant closing because the Company did not know that further financing would be denied. The Company also believed that giving the required notice would have precluded the Company from obtaining the needed financing which would have been sufficient to avoid or postpone the shutdown.

Pls.' Ex. 50.

As agreed, Comptech turned over the assets pledged as collateral to TIFD, which conducted a liquidation of the assets. TIFD also attempted to fill outstanding orders. The proceeds partially satisfied Comptech's obligations to GE Capital, and the lender wrote off the balance of the debt in 1996.

This action, brought by former Comptech employees against Comptech and the GE Capital defendants, followed.

## II. Summary Judgment Standard

Summary judgment is proper where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Childers v. Joseph,* 842 F.2d 689 (3d Cir.1988). "Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A court considering summary judgment must examine the entire record in the light most favorable to the nonmoving party, and draw all reasonable inferences in its favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. Analysis

The WARN Act requires employers of 100 persons or more to give their employees sixty days written notice prior to a plant closing or mass layoff. 29 U.S.C. § 2102(a). An employer who violates WARN, and who is not protected by certain narrowly-construed exceptions, is liable to each aggrieved employee for back pay and benefits. 29 U.S.C. § 2102(a)(1). It is clear to us that the factual background of the Comptech closing establishes the essential elements of a WARN cause of action. It is undisputed that the closing of the Comptech facility was a "plant closing," which constituted a "WARN event" and caused an "employment loss" to the requisite number of employees. Comptech notified its employees of the closing on the same day the plant ceased operation, and thus provided insufficient notice under the WARN Act.

As previously noted, we have entered a default judgment against the employer on the charges contained in the complaint. The sole question before us today is whether WARN liability attaches to the remaining defendants to this lawsuit, the GE Capital defendants, as "employers" under the statute, so that they may be held liable for Comptech's failure to notify its employees as the Act requires.

Plaintiffs contend that we must grant summary judgment in their favor under three different theories, each of which is premised on GE Capital's alleged control over Comptech: (1) they contend that GE Capital is liable as a matter of law because it held the voting rights to all of Comptech's stock after June 22, 1994; (2) they argue that GE Capital is liable as a WARN employer under general principles of corporate law, because it was Comptech's parent corporation and owner, or because it acted as Comptech's alter ego; and (3) they assert that GE Capital is directly liable as an "employer" under the WARN Act because of the degree of control it exercised, through the loan documents, over Comptech. We will address these arguments *seriatim.*

### A. Lender Liability Under WARN

Before turning to the plaintiffs' theories of liability, however, we must first consider

whether such liability may attach to a creditor such as GE Capital. The Court of Appeals for the Third Circuit has not yet decided whether a secured creditor may be considered an employer under the WARN Act, and, if so, what the threshold for such liability might be.

The Act itself clearly holds only the employer liable for a failure to warn. In deciding whether a secured creditor may fall under the statutory definition of "employer," we look first to the plain language of the statute, which provides as follows:

> (1) the term "employer" means any business enterprise that employs—
>
>> (A) 100 or more employees, excluding part-time employees; or
>>
>> (B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime);

29 U.S.C. § 2101(a)(1).

Thus, the statute's definition of "employer" considers only the size of the workforce, and does not contemplate the sorts of entities which might, under certain conditions, assume employer status under the Act.

■ Since the statutory language alone fails to satisfy our inquiry, we turn to the Department of Labor's ("DOL") final regulations and commentary. Agency interpretation is accorded deference when courts are deciding the meaning or reach of a statute. *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Here, the agency's regulations do not directly speak to whether a secured creditor may be considered a WARN employer. However, they do address a somewhat analogous situation where a fiduciary or trustee in a bankruptcy action takes possession of a debtor's business assets. The DOL's commentary states that under certain conditions, liability as a WARN employer attaches to the trustee:

> DOL agrees that a fiduciary whose sole function in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligations of the former employer because the fiduciary is not operating a "business enterprise" in the normal commercial sense. In other situations, where the fiduciary may continue to operate the business for the benefit of creditors, the fiduciary would succeed to the WARN obligations of the employer precisely because the fiduciary continues the business in operation.

54 Fed.Reg. 16,045 (1989).

Thus, the agency's interpretation of the statute indicates that WARN liability may attach to an entity other than the employer.

To date, only two courts of appeals that have considered whether a secured creditor such as GE Capital may be held to employer liability under WARN. *See Adams v. Erwin Weller Co.,* 87 F.3d 269, 271 (8th Cir.1996); *Chauffeurs, Sales Drivers, Warehousemen & Helpers Union Local 572 v. Weslock Corp.,* 66 F.3d 241, 244 (9th Cir.1995). In the view of the Ninth Circuit, a lender acts as an employer when it operates the borrower's assets as a "business enterprise" in the "normal commercial sense." *Weslock,* 66 F.3d at 244 (quoting 54 Fed.Reg. 16,045 (1989)). The Eighth Circuit adopted that holding, finding that "only when a lender becomes so entangled with its borrower that it has assumed responsibility for the overall management of the borrower's business" will the degree of control necessary to consider a secured creditor as an employer have been reached. *Adams,* 87 F.3d at 272.

■ We are in agreement with these jurisdictions that WARN's obligations can attach to a secured creditor, and that there is a point at which the actions taken by a lender to secure its investment exhibit such a high degree of control over the debtor corporation that the creditor assumes the overall management of the business.

Thus, our reading of the statute together with the DOL commentary leads us to

conclude, in accordance with *Weslock* and *Adams,* that under some circumstances a secured creditor such as GE Capital may incur liability as an employer under WARN, and may be held responsible for a failure to provide the affected employees with the required sixty days notice of a plant closing.

We turn now to the inquiry which logically follows this determination: does such liability attach to defendant GE Capital, under the circumstances presented by this case?

### B. Liability under *Board of Trustees of Trucking Employees v. Centra*

■ The plaintiffs' first theory of liability asserts that the defendants are directly liable as a matter of law because they possessed an unconditional right to vote Comptech's stock as of June 22, 1994, the date on which GE Capital gained a bring-along call on Villa's stock, and thus controlled the company. Plaintiffs contend that *Board of Trustees of Trucking Employees v. Centra,* 983 F.2d 495 (3d Cir. 1992), establishes their position as a matter of law.

Plaintiffs' reliance on this case is misplaced. The question in *Trucking Employees* was whether Centra, the employer, was in "common control" with another corporation, and thus was required to make contributions to the multiemployer benefit plan from which the other corporation had withdrawn. Making this determination required the court to interpret the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381 et seq., which amended provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. The court held that, under ERISA, a corporation controls another corporation when it owns eighty percent of the total value of all outstanding shares of stock. *Trucking Employees,* 983 F.2d at 502. The court further held that holding stock options constitutes constructive ownership of the stock for ERISA purposes. *Id.*

We do not find this a controlling principle of law for determining whether a lender, holding stock or stock options as security for its loans, controls the borrower so as to incur liability as a WARN employer. Plaintiffs' motion for summary judgment, insofar as it is premised upon this theory, is without merit and will be denied.

### C. Liability under General Theories of Corporate Law

Plaintiffs also contend that GE Capital is liable as a WARN employer under general principles of corporate law: specifically, a parent corporation's liability for the actions of its subsidiary, and a controlling corporation's liability under the instrumentality and alter ego theories.

#### i. Comptech was not GE Capital's Subsidiary

■ The argument presented in the plaintiffs' submissions rests upon an assertion that Comptech was a subsidiary of its lender. Pls.' Br. (Doc. 94) at 58. The plaintiffs then conclude that, under the tests set out in *Local 397 v. Midwest Fasteners, Inc.,* 779 F.Supp. 788 (D.N.J.1992), we must find that parent GE Capital is liable, under WARN, for the acts of its subsidiary. Pl.s' Br. (Doc. 94) at 58–85. Plaintiffs' entire argument in this regard is premised upon the existence of a parent-subsidiary relationship for which it has no proof.

The question before the *Midwest Fasteners'* court was whether, under WARN, a parent corporation could be held liable for the actions of a subsidiary. Liability alone was at issue; it was undisputed that defendants were a parent corporation and three subsidiaries. *Id.* at 796. Thus, the case does not address whether the connection between a secured lender and its creditor, should be analyzed as a parent/subsidiary relationship.

Which rules of law to apply in determining whether the parent could be held liable was a question of first impression for the *Midwest Fasteners'* court, and it decided that the analysis should proceed under three distinct standards: (1) the Third Circuit's common law alter ego doctrine, also

known as piercing the corporate veil; (2) the "single employer" theory as developed in federal labor statutes; and (3) the five-factor test set out by the DOL in 20 C.F.R. § 639.3(a)(2).

The *Midwest Fasteners'* court then considered whether the operations of the parent and the subsidiary were so interrelated that the parent should be found liable as a WARN employer. Applying each test separately to the facts of the case, the court considered whether each analysis favored the plaintiffs or the defendants; ultimately, under the totality of the circumstances, the court held that the parent corporation was liable.

■ *Midwest Fasteners*, then, stands for the proposition that a parent may be held liable as a WARN employer when a subsidiary closes a plant without providing notice, and sets forth the proper analytical framework for assessing such liability.

Although the plaintiffs here accurately set out the appropriate standards to apply in a parent/subsidiary case, they have failed to provide credible evidence from which to conclude that Comptech was GE Capital's subsidiary in the first place. The plaintiffs' sole evidence of Comptech's subsidiary status is a definition of "subsidiary" taken from 15 Pa.C.S.A. § 2542, which governs the establishment and conduct of registered corporations in Pennsylvania. This statute reads, in pertinent part:

> "**Subsidiary**." Any corporation as to which any other corporation has or has the right to acquire, directly or indirectly, through the exercise of all warrants, options and rights and the conversion of all convertible securities, whether issued or granted by the subsidiary or otherwise, voting power over voting shares of the subsidiary that would entitle the holders thereof to cast in excess of 50% of the votes that all shareholders would be entitled to cast in the election of directors of such subsidiary, except that a subsidiary will not be deemed to cease being a subsidiary as long as such corpo-

ration remains a controlling person or group within the meaning of this subchapter.

15 Pa.C.S.A. § 2542.

Plaintiffs' argument appears to be that GE Capital was Comptech's parent because it possessed the call rights to Comptech's stock as security for its loans. We do not read this portion of Pennsylvania's corporations law as applying to the relationship between a secured lender and a debtor corporation, and we note that the plaintiffs have not provided any cases supporting their position. Since there is no evidence that GE Capital was Comptech's parent, we need not apply the multi-faceted analysis set forth in *Midwest Fasteners* for piercing the corporate veil under such a scenario. Plaintiffs' motion for summary judgment will be denied insofar as it is premised upon a parent-subsidiary relationship.

### ii. Lender Liability and Piercing the Corporate Veil

We are well aware, however, that a small number of courts have applied piercing the veil jurisprudence to the relationship between a borrower and a lender, in a context other than that of a parent corporation and its subsidiary. These cases, whether analyzed under the alter ego theory or the instrumentality doctrine, focus on the excessive and inequitable use of control by a dominant corporation over an allegedly subservient one. Courts as well as commentators have recognized that the degree of control necessary to require the setting aside of the corporate construct, may at times arise from the economic power of a lender and the corresponding economic dependence of a borrower.

As one commentator has explained, "[w]hen the borrower is in default, the previous arm's-length relationship may be transformed into a comparable pattern of domination and subservience with the bank utilizing its superior economic power over a borrower to influence, if not dictate, major decisions of the borrower."[3] The

---

**3.** Phillip I. Blumberg & Kurt A. Strasser, *The*     *Law of Corporate Groups: Enterprise Liability*

question then arises whether the lender's participation in the borrower's decision-making process has reached such a degree that it has legal consequences. *Id.* Reported cases applying this theory are rare, and have involved the lender's alleged responsibility for the borrower's debts,[4] most often in the context of equitable subordination in bankruptcy,[5] as well as a lender's statutory liability with respect to the borrower's property in actions brought under the Comprehensive Environmental Response, Compensation, and Liability Act. 42 U.S.C. §§ 9601 *et seq.* (1994) ("CERCLA").[6] Although we have found no case in which this analysis has been used to determine lender liability under the WARN Act, given our conclusion that a secured lender **may** be liable as a WARN employer, we think it prudent to address all relevant theories of potential liability.

Whether GE Capital took total and actual control over Comptech, so as to function as Comptech's alter ego or to make Comptech the lender's instrumentality, is a question of law for the courts to decide. *James E. McFadden, Inc. v. Baltimore Contractors, Inc.*, 609 F.Supp. 1102, 1104 (E.D.Pa.1985). It is the plaintiffs' burden to show that the corporate veil in this case should be pierced, and that we should hold GE Capital liable for Comptech's own failure to give its employees the sixty days notice of a plant closing that is required under WARN.

Ordinarily, a lender does not owe a fiduciary duty to a borrower. *Blue Line Coal Company, Inc. v. Equibank*, 683 F.Supp. 493, 496 (E.D.Pa.1988), citing *Federal Land Bank v. Fetner*, 269 Pa.Super. 455, 410 A.2d 344 (1979). We note that courts have been extremely reluctant to pierce the corporate veil in lender liability

cases, and have permitted lenders to engage in a broad range of conduct to protect their investments without equating such financial controls with the degree of control necessary to impart liability to the lender as the dominant corporation.

For example, allowing the creditor's agent to negotiate settlements and claims, and to designate the order in which other creditors were paid, does not show that the lender had actual control over the debtor. *Krivo*, 483 F.2d 1098, 1111. Similarly, monitoring the borrower's operations and offering management advice is not sufficient control to incur liability. *In re W.T. Grant, Co.*, 699 F.2d 599, 610–11 (2d Cir. 1983), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97(1983); *Krivo*, 483 F.2d at 1105; *Temp–Way Corp. v. Continental Bank*, 139 B.R. 299, 318 (E.D.Pa.1992). Taking an active part in managing the borrowing company, without more, is not total and actual control. *Riquelme Valdes v. Leisure Resource Group, Inc.*, 810 F.2d 1345 (5th Cir.1987) (no actual control even though creditor had to approve debtor's business expenses); *Chicago Mill & Lumber Co. v. Boatmen's Bank*, 234 F. 41 (8th Cir.1916) (no actual control even though creditor corporation elected one of its employees as president of the debtor corporation and gave management directives); *McFadden*, 609 F.Supp. at 1105 (no actual control even though surety company gave instructions to subcontractors, required complete access to books, and required debtor to pay over all receipts).

### iii. Comptech was not GE Capital's Instrumentality

*Krivo* is the leading case on whether a creditor corporation may be

---

in *Commercial Relationships*, Aspen Law & Business 560 § 15.01 (1988).

4. See, e.g. *Valdes v. Leisure Resource Group, Inc.*, 810 F.2d 1345 (5th Cir.1987); *Krivo Industrial Supply Co. v. National Distillers & Chemical Corp.*, 483 F.2d 1098 (5th Cir.1973), *modified factually* 490 F.2d 916 (5th Cir. 1974).

5. *In re M. Paolella & Sons, Inc.*, 161 B.R. 107 (E.D.Pa.1993); *Markowitz v. Heritage Bank*, 25 Bankr.963 (Bkrtcy.D.N.J.1982).

6. *United States v. Fleet Factors Corp.*, 901 F.2d 1550 (11th Cir.1990), *cert. denied*, 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991); *Guidice v. BFG Electroplating & Mfg. Co., Inc.*, 732 F.Supp. 556 (W.D.Pa.1989).

held liable for the obligations of a debtor corporation under the instrumentality doctrine. 483 F.2d 1098. Under *Krivo,* a lender may be found liable for the obligations of a subservient debtor corporation where "it misuses that corporation by treating it, and by using it, as a mere business conduit for the purposes of the dominant corporation." *Id.* at 1102. Under this theory, the dominant corporation may be liable if it is so involved with the debtor that it is in fact managing the debtor's affairs. *Id.* at 1104. Courts applying the instrumentality rule to a debtor-creditor relationship have required a strong showing that "the creditor assumed actual, participatory, total control of the debtor." *Id.* at 1105. Where liability has been found, it has been based on a finding "that the subservient corporation in reality had no separate, independent existence of its own." *Id.* at 1105. It has long been recognized that "it is not 'controlling influence' that is essential. It is actual control of the action of the subordinate corporation." *Krivo,* 483 F.2d at 1106, quoting *In re Kentucky Wagon Mfg. Co.,* 3 F.Supp. 958, 963 (W.D.Ky.1932), *aff'd* 71 F.2d 802 (6th Cir.), *cert. denied, Laurent v. Stites,* 293 U.S. 612, 55 S.Ct. 142, 79 L.Ed. 701 (1934).

One commentator has defined this degree of control as follows:

> The control necessary to invoke what is sometimes called the "instrumentality rule" is not mere majority or complete stock control but such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal.

*Krivo,* 483 F.2d at 1106, quoting 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 4, 204–205 (perm. ed. rev. 1963).

▪ The plaintiffs point to language in a number of GE Capital's memoranda as proof that the creditor exercised complete control over Comptech's business decisions, and they emphasize that the Loan Agreement required the lender's assent to expenditures which would affect the secured assets. We have previously enumerated these restrictions, and we now find them consistent with the control a lender is entitled to exercise to secure a $24.9 million dollar loan. *See infra* p. 514–15, *citing* Pls.' Ex. 100 at 65–71.

The plaintiffs further assert that because there was regular communication between Comptech and the lender over the issues encompassed by the Loan Agreement, Comptech was being controlled by GE Capital. Certainly the record indicates many instances of communication over a variety of business decisions which could not be undertaken under the Loan Agreement without GE Capital's assent. One of many examples of such communication involved Comptech's proposed management bonus and employee incentive plan, which suggested executive compensation in excess of the cap set in the Loan Agreement. Comptech's CFO, Frank Kerrigan, presented the incentive plan to the lender by letter; Jeanette Chen then summarized the loan history and proposed compensation in a memo to her supervisor, J.M. Greeley, and recommended that Greeley approve the plan with certain restrictions. Pls.' Ex. 52. He did, and Chen so notified Kerrigan. Pls.' Ex. 53. Our reading of the documents submitted by both parties to this dispute shows this to be fairly typical of the exchange between Comptech and GE Capital on matters where Comptech made business decisions on matters that would affect secured assets. The restrictions in the Loan Agreement were the sort of control permitted a secured lender, and do not indicate the degree of control necessary to pierce the corporate veil. This exchange, and the others cited by the plaintiffs in their submissions, simply reflect a major creditor's approval, as required by the Loan Agreement, of a decision which would have a direct impact on the borrower's ability to repay its loans. We have reviewed the numerous instances of such correspondence in this case, and see no evidence

that GE Capital was acting in a capacity other than as a secured lender.

In other words, we find no evidence that GE Capital was impermissibly controlling Comptech's affairs. Furthermore, the record is replete with examples of Comptech's day-to-day management of its own business decisions. Comptech made decisions to buy and sell obsolete equipment, soliciting bids and making arrangements for these transactions. Pls.' Ex. 132. The company purchased new grinding and molding equipment, and financed that purchase through another lender, USL Capital. Pls.' Ex. 134. It entered into a licensing agreement with Grain Tech to produce gas-assisted injection molded parts. Pls.' Ex. 137.

Comptech also created a new subsidiary, Comptech de Mexico, after one of the company's major clients, Mars Electronics, moved its manufacturing facility to Mexico and suggested that Comptech open a plant to handle Mars' business there. In setting up the project, Comptech negotiated with Mexican financial institutions to arrange working capital, and negotiated the purchase of a Mexican company, Phoenix International. Pls.' Ex. 147. Closer to home, Comptech proposed consolidating its Millcreek facility with Accu–Form in a new building, and proceeded to negotiate with its landlord and with contractors. Pls.' Ex. 155.

In short, the uncontradicted evidence shows that Comptech made its own decisions regarding products, production, employment, sales, marketing, personnel, creating subsidiaries, and buying and selling equipment. GE Capital did not make these business decisions, even though the creditor's assent was required before Comptech made any changes which involved restrictions in the Loan Agreement. Our thorough review of the record has convinced us that the control GE Capital exercised was in accordance with the Loan Agreement, and was consistent with its role as Comptech's secured creditor.

Accordingly, we find that the plaintiffs have failed to carry their burden of showing that GE Capital assumed actual, total, participatory control over Comptech, and we reject their argument that the one was simply the instrumentality of the other.

### iv. Comptech was not GE Capital's Alter Ego

■ The plaintiffs also contend that we should pierce the corporate veil under a related control theory, the alter ego theory. In this circuit, the factors to be considered for piercing the corporate veil under an alter ego theory include (1) gross undercapitalization; (2) failure to observe corporate formalities; (3) failure to pay dividends; (4) the insolvency of the debtor corporation; (5) siphoning of funds by the dominant stockholder; (6) nonfunctioning officers or directors; (7) absence of corporate records; (8) intermingling of funds; (9) the fact that the subservient corporation is merely a facade for the operations of the dominant stockholder; and (10) a finding of fraud or fundamental unfairness. *Midwest Fasteners,* 779 F.Supp. at 792, citing *United States v. Pisani,* 646 F.2d 83, 88 (3d Cir.1981).

■ No single criterion is dispositive, and the list itself is not exhaustive. To succeed on the alter ego theory, the plaintiffs must establish that "the controlling corporation wholly ignored the separate status of the controlled corporation and so dominated and controlled its affairs that its separate existence was a mere sham." *Jiffy Lube International, Inc. v. Jiffy Lube of Pennsylvania, Inc.,* 848 F.Supp. 569, 580 (E.D.Pa.1994), quoting *Culbreth v. Amosa (Pty) Ltd.,* 898 F.2d 13, 14 (3d Cir.1990). Where an evaluation of these and other related factors shows that the borrower did not have a separate identity and was a mere sham company, courts have looked through the formal corporate distinction between them and held the lender liable for the debtor's obligations.

■ Plaintiffs' argument that Comptech functioned merely as GE Capital's alter ego and did not have a separate

identity of its own is not persuasive, and they have not met their burden as to any of the elements of the theory. The contention that GE Capital kept Comptech undercapitalized is particularly difficult for us to assess, since the plaintiffs have failed to present any competent evidence on this issue. Certainly, the record shows that Comptech was in financial trouble and that it continually defaulted on its loans and required additional funds from its lender, but this does not mean that GE Capital kept the company undercapitalized. Indeed, the record further indicates that GE Capital loaned millions of dollars to the company. Plaintiffs cite no governing rule of law, nor have we found one, which suggests that a borrower's inability to pay stock dividends or loan interest is proof that it has been undercapitalized by its lender.

Nor is there any credible record evidence that the corporation failed to observe corporate formalities. In fact, it is clear to us from the record that Comptech's corporate identity was distinct from that of its creditor. Comptech's corporate counsel, Dykema Gosset, issued an opinion letter attesting to Comptech's incorporation under Delaware law. Defs.' Supp. Ex. 21 at 4. Comptech's local counsel, Mac-Donald, Illig, Jones & Britton, LLP, issued a similar letter on Accu–Form's behalf. Defs.' Supp.Ex. 22 at 4. These two firms represented Comptech and its subsidiaries at all relevant proceedings, including the negotiations leading to the asset turnover agreement. The defendants, on the other hand, were represented by Sidley & Austin, a Chicago firm, and they retained Knox McLaughlin Gornall & Sennett, P.C., as local counsel.

The record shows no commingling of funds. Comptech's bank accounts were maintained at PNC Bank, N.A., and no one from GE Capital had the authority to sign checks drawn on these accounts. Chen Aff. at ¶ 13. Comptech maintained its own accounting department, under the supervision of company controller James Brunk. Comptech generated its own financial statements, and engaged the na-tional accounting firm KPMG Peat Marwick as its accountants. Burke Dep. at 111. There is no evidence that GE Capital had any role in these internal financial proceedings.

To further their argument that Comptech failed to observe corporate formalities, plaintiffs complain that the defendants have not produced Comptech's corporate documents. It was not GE Capital's burden to produce Comptech's corporate minutes, and we deny this argument as being without merit.

Plaintiffs strenuously argue that Comptech's directors and officers did not function independently, but were directed by GE Capital. As proof, the plaintiffs contend that certain statements made by Thomas Gafffney and Charles Villa, in separate letters to GE Capital, show that the lender, and not Comptech's officers, was in control of the company. The first letter was written by Gaffney, then Comptech's chairman of the board, to Ed Christie at GE Capital, and is dated March 14, 1994. Pls.' Ex. 14. In that letter, Gaffney outlines Comptech's current business situation. He states that Comptech has increased its sales, engineering, and quality control capabilities, he summarizes cash flow for items outside of normal capital expenditures, and he lists potential new projects with seven separate clients. Gaffney closes with the following: "As you can see from the above, a lot of things are happening at CompTech. We need to know what G.E. wants us to do. We are proceeding with items 2, 3, and 4, but we need to get confirmation from G.E. on each one of these items. Obviously, without G.E.'s help we cannot proceed to complete our plans. I am prepared to do whatever G.E. wants relative to Comp-Tech." Pls.' Ex. 14.

The plaintiffs contend that Gaffney's letter, particularly the final statement, is evidence that GE Capital controlled Comptech. We do not agree. Under the terms of the Loan Agreement, GE Capital's assent was required for the aforementioned

items 2, 3, and 4; these items pertained to Comptech's acquisition of Accu–Form, and its plans to lease a new building. We read Gaffney's letter as asking for assent under the Loan Agreement to take steps that could affect GE Capital's ability to recover its debt, and as further requesting a waiver of some of the terms of that agreement.

We similarly reject the plaintiffs' reading of Charles Villa's letter to Jeanette Chen, which is dated May 16, 1994. Pls.' Ex. 7. In that letter, Comptech's president outlines the current state of Comptech's business, including revenue loss, increased labor costs and overhead, and weak core customer sales, and he emphasizes the company's need for increased loans to upgrade its equipment and facilities. Villa beseeches the lender to make more money available, so that Comptech can continue to compete favorably in the industry. "G.E. needs to make decisions now on all the issues outlined in this memo," Villa writes. "How you respond will then dictate what the management of Comptech will need to do to accomplish the task at hand." Pls.' Ex. 7. We read this document as we did Gaffney's letter, as a borrower explaining why it needs more money, and asking that certain decisions, which are required by the Loan Agreement, be made without delay, so that Comptech will know which projects to implement. We do not read this letter as evidence that GE Capital controlled Comptech.

To further their theory that Comptech's officers did not actually control the company, plaintiffs claim that GE Capital manipulated Gaffney's firing and required Comptech to hire Stewart Benton as a consultant. Under the Loan Agreement, consulting agreements required the lender's assent, and we have previously held that the terms of the Loan Agreement were appropriate as security for GE Capital's loans. In her deposition testimony, Jeanette Chen explained that Gaffney had been hired pursuant to a consulting agreement, and when that agreement had reached its end GE Capital did not assent to an extension of his agreement. Chen Dep. at 233. We do not see the circum-

stances of Gaffney's departure from Comptech as evidence that GE Capital was running the company.

Plaintiffs also point out that GE Capital used an executive search firm, IMCOR, to identify potential individuals Comptech could retain as consultants, and they offer this as proof of GE Capital's control. Jeanette Chen testified that GE Capital asked IMCOR to identify possible consultants for Comptech. Chen Dep. at 139–140. IMCOR suggested that Comptech hire Stewart Benton. *Id.* Benton was hired by Comptech, and not by GE Capital. *Id.* Benton himself testified that during his time as a consultant for Comptech, he reported directly to Comptech's president, Chuck Villa, and that his activities were not directed by GE Capital. Benton Aff. at ¶¶ 7, 8, 10. In any event, there is no evidence that GE Capital acted in any manner with regard to Benton's employment as a consultant that exceeds the conduct ordinarily permitted a secured lender, since even taking an active role in managing the affairs of the borrowing company is not evidence of lender control. *Adams,* 87 F.3d at 272; *Krivo,* 483 F.2d at 1105; *McFadden,* 609 F.Supp. at 1105.

Not only have the plaintiffs failed to offer proof that GE Capital controlled Comptech so that the latter had no separate identity, but the GE Capital defendants have produced the uncontradicted testimony of Comptech's local managers, some of whom are members of the plaintiff class, that they themselves managed and controlled the corporation. This evidence includes the affidavits or deposition testimony of Charles Villa, Comptech's president; Paul Dier, Comptech's plant manager; Kenneth Thomasetti, vice-president of operations; Henry Makie, director of sales and marketing; James Brunk, controller and chief financial officer; Douglas Kruse, vice-president of product and corporate development; Genevieve Putnam, director of human resources; and Thomas Pearson, named plaintiff in this action, who was first employed as personnel administrator for

Accu–Form, and who testified that, while at Comptech, he was "involved in ... personnel management, quality control management, purchasing and sales and marketing." Pearson Dep. at 26.

The uncontradicted testimony of these former Comptech managers shows that Comptech's own officers and managers controlled its business and management decisions. We conclude that the plaintiffs have failed to produce any evidence to show that Comptech was controlled by GE Capital instead of by its officers.

The plaintiffs also claim that GE Capital siphoned funds from Comptech. This argument is premised on the fact that, when Comptech sold its subsidiary, R & R Plastics, it used the funds to prepay its debt to GE Capital. The record indicates that Comptech merged R & R Plastics with Accu–Form when it acquired the latter company. Comptech then negotiated and signed a purchase agreement to sell R & R's remaining equipment, machinery, inventory, and real estate to Fulton Industries. Pls.' Ex. 104. Since GE Capital had a secured interest in R & R Plastics, the lender's approval was required under the Loan Agreement before this equipment could be sold. Comptech used approximately $700,000 in proceeds from this sale to comply with prepayment terms in the Loan Agreement and to prepay its term debt to GE Capital. Plaintiffs' reasons for characterizing this as "siphoning funds," are unclear to this Court. In any event, we do not see these transactions as evidence of GE Capital's control over Comptech; if anything, it would seem that Comptech made a sound business decision when it found a buyer for the unneeded assets, and applied the proceeds to a debt it surely owed.

The plaintiffs offer no proof on the final factor in an alter ego analysis, fraudulent intent. They briefly reiterate an assertion made earlier in their brief that GE Capital is "collaterally estopped from asserting that they did not control Comptech as of July 10, 1991," when it filed its motion for injunctive relief in dis-

trict court in the Northern District of Illinois. Pls.' Br. at 71. Issue preclusion prevents the relitigation of questions which have been previously determined by another court. It is appropriate only where (1) the identical issue was decided in a prior adjudication; (2) there was a final judgment on the merits; (3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom the bar is asserted had a full and fair opportunity to litigate the issue in question. *Temple University v. White*, 941 F.2d 201, 212 (3d Cir.1991), *cert. denied*, 502 U.S. 1032, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992).

We need not engage in a full analysis of the preclusion doctrine, since the plaintiffs have failed to meet the first prong of the test. The Illinois court was faced with an entirely different issue than the one which must be determined here. The question before that court was whether, after the borrowers defaulted and replaced the boards of directors of the debtor corporations in accordance with provisions in the loan documents, the creditor was entitled to enjoin the former boards of directors from bringing bankruptcy proceedings. The district court determined that, under the loan agreements, GE Capital was entitled to take the actions it had taken, and the court granted the lender's motion for injunctive relief. Contrary to the plaintiffs' argument here, the Illinois court did **not** determine that GE Capital controlled Comptech in any broader context, and certainly not so as to hold it liable for Comptech's failure to notify its employees that the plant was closing.

In summary, the plaintiff class has failed to meet its burden of proof on either the alter ego or the instrumentality theories. We conclude that there is no evidence that GE Capital controlled Comptech's functional operations, assumed actual, participatory control of the company, or so dominated and controlled its affairs that its separate existence was a mere sham. Accordingly, we will deny plaintiffs' motion

for summary judgment insofar as it relies on either the alter ego or instrumentality doctrines, and will grant summary judgment in favor of the defendants on these theories.

### D. Direct Liability under WARN

■ The plaintiffs' final argument is that GE Capital is directly liable as an employer under the WARN Act because (1) it made the decision to close the plant, (2) it controlled and operated Comptech as a business enterprise, and (3) it acted in ways which are inconsistent with the conduct of a secured lender.

In deciding when a secured lender may be found directly liable as a WARN employer, we return to the decisions in *Weslock*, 66 F.3d 241 (9th Cir.1995), and *Adams*, 87 F.3d 269 (8th Cir.1996), the only two cases which have addressed this question. Each of these cases held that WARN liability may attach to a secured lender if the requisite degree of control over the borrower has been reached. A brief summary of the courts' reasoning will be helpful in our analysis.

The loan in *Adams* was secured by a number of restrictions in the loan documents, including a security interest in the company's assets, a lockbox arrangement for the company's cash receivables, and a revolving line of working capital for daily operations. The loan documents further permitted the lender to monitor the company's assets, inventory, and expenditures, and to prohibit changes in the company's capital structure. *Id.* at 272. The court found these restrictions perfectly compatible with the lender's need to secure a loan of over eighteen million dollars. *Id.* The *Adams* court did not reach the ultimate issue of when such control exists, since it found that the creditor had never operated the plant as a business enterprise in the normal sense, and that the relationship between the parties was never more than a traditional debtor-creditor relationship. *Id.* at 272–73.

The *Adams* court also addressed the extent of the lender's influence over management decisions, which included suggesting management changes, recommending that the company hire certain individuals, proposing new methods to improve the company's profitability, and closely monitoring the company's "deteriorating financial condition." *Adams*, 87 F.3d at 272. Since these are the sorts of actions a major lender would take vis-a-vis a troubled borrower, none of these made the lender a WARN employer. The court found the lender's influence over the company "entirely 'consistent with the type of control a secured creditor legitimately may exercise over a defaulting debtor to protect [its security interest].'" *Adams*, 87 F.3d at 272, quoting *Weslock Corp.*, 66 F.3d at 245.

In circumstances similar to those before us, the creditor in *Adams* ultimately refused to provide additional working capital and called in its loans, knowing that without these funds the company would be forced to close. The court specifically found that this did not make the lender an employer under WARN. The court found it significant that the lender did not hire, fire, pay, or supervise the company's employees, and thus did not assume an employer's role with those employees. In its role as a secured creditor, "it took possession of its collateral and never reopened the plant for business." *Adams*, 87 F.3d at 273.

In *Weslock*, the only other court of appeals decision to have addressed lender liability as a WARN employer, the security agreement provided that the loans would be secured by the borrowers' manufacturing plants. When the borrowers defaulted after nearly four years, the secured creditor agreed to accept the surrender of the collateral and the parties negotiated such an agreement. When the creditor refused to advance more funds, Weslock's management notified the plant's employees that their employment was terminated. At issue was whether the lender had assumed control of day-to-day operations at the plant between the date the agreements

528

were signed and the date the plant was closed, a period of about six days.

The Ninth Circuit found that the lender had continued to behave as a secured creditor and was not liable as a WARN employer because it did not participate in the "functional operations" of the Weslock plant: the creditor did not participate in decisions concerning production, marketing, or employment practices. *Weslock*, 66 F.3d at 245. In this case the lender was responsible for approving or disapproving additional credit to the company on a day-to-day basis, but such financial control did not incur WARN liability. The court held that "WARN's notice obligation simply does not apply to a secured creditor ... whose interaction with the delinquent debtor primarily is limited to financial controls designed to preserve its security interest." *Id.* at 245.

■ *Adams* and *Weslock* clearly reaffirm the basic tenets of lender liability, which allow a creditor broad leeway to protect its security interest in the defaulting company. These include monitoring assets, inventory, and expenditures; prohibiting changes in the debtor company's capital structure; influencing management decisions and suggesting changes in personnel. A creditor may hold a security interest in the debtor's assets. It may refuse to extend additional credit, call in its loans, and take possession of secured collateral, even though these decisions will cause the debtor company to cease operations and close the facility, all without exhibiting the degree of control over the debtor's business which could result in WARN liability as an employer. Under *Adams* and *Weslock* a lender may be considered an employer under WARN only when it operates the borrower's assets as a business enterprise in the normal commercial sense; when it assumes overall responsibility for the management of the borrower's business; when it assumes an employer's role with the borrower's employees, by hiring, firing, paying, or supervising them; or when it participates in the functional operations of the borrower's

business, including making decisions regarding production, marketing, or employment practices.

Plaintiffs attempt to distinguish these two cases by asserting that the Loan Agreement gave GE Capital a higher degree of control over Comptech's business than either of the creditors in *Adams* or *Weslock* possessed. However, we reiterate our conclusion that the restrictions in the Loan Agreement are not evidence that GE Capital controlled Comptech's business activities, but instead represent legitimate steps taken by a lender to secure its investment. Much of our previous analysis of alter ego or instrumentality liability in this case also applies to the question of direct control under WARN. *See infra* pp. 520–27. Without repeating that analysis, we find that Comptech, through its managers, controlled its own business activities within the meaning of *Adams* and *Weslock*.

Plaintiffs next contend that when GE Capital decided to stop extending credit and foreclosed on Comptech's assets, knowing that doing so would most likely force the company to close, the creditor in effect made the decision to close the plant. We do not agree. The *Adams* court rejected the argument that similar circumstances made the creditor an employer under WARN, and so do we. 87 F.3d at 273. GE Capital acted at all times as a secured lender, and is not liable under the statute for the decision to close the Comptech facility.

Plaintiffs also insist that GE Capital took control of Comptech's stock on July 10, 1991, and that this is evidence that the lender controlled the company from that date forward. The record, however, shows that Gaffney and Brooks held all of Comptech's common stock until they transferred that stock to Villa in June of 1994. GE Capital did have stock pledges as a legitimate security interest on its loans, as well as a "bring-along call" on Villa's stock. The plaintiffs claim that these call rights are further proof of GE Capital's control.

However, both Jeanette Chen and plaintiffs' expert, Thomas A. Myers, CPA, CFA, agreed that such call rights provide a means to facilitate the sale of a company, and are not a means of controlling its management or its operations. Chen. Dep. at 204; Myers Dep. at 157. We find that plaintiffs' argument that the bring-along call on Villa's stock shows that GE Capital controlled Comptech is without merit.

Finally, the plaintiffs argue that the testimony of their expert. Thomas A. Myers, is sufficient to defeat summary judgment. In Mr. Myers opinion, GE Capital's actions were not consistent with the financial controls normally found in a debtor/creditor relationship. Myers Report at 5.

■ A party cannot avoid the entry of summary judgment solely on the basis of an expert affidavit, when the affidavit lacks a sufficient basis in fact. *Maldonado v. Ramirez,* 757 F.2d 48, 51 (3d Cir.1985). "An affidavit that is 'essentially conclusory and lacking in specific facts' is inadequate to satisfy the movant's burden" under Fed. R.Civ.P. 56(e). *Id.,* quoting *Drexel v. Union Prescription Centers, Inc.,* 582 F.2d 781, 789–90 (3d Cir.1978). Although he concluded that GE Capital controlled and directed Comptech, Mr. Myers admitted that he did not have an understanding of Comptech's manufacturing operation. Myers Dep. at 18–19. Nor did he consider the company's functional operations or the roles played by the individuals in its management team. Myers Dep. at 16–17; 71–72. We must conclude that Mr. Myers' opinion lacks a sufficient basis in the relevant facts of this case for us to deny defendants' motion for summary judgment solely on its conclusions, and the plaintiffs have offered no other credible evidence to support their position that GE Capital directed and controlled Comptech so as to be liable as an employer under WARN.

Accordingly, we find that there is no evidence from which to find that GE Capital controlled Comptech so as to be held directly liable as an employer under the WARN Act.

## IV. Conclusion

The circumstances that led to this lawsuit are indeed unfortunate. We are well aware that Comptech's closing worked an enormous hardship on the greater Erie area, and was a severe blow to the plant's individual employees and their families. Although a default judgment has been entered against Comptech, the plaintiff class appears to have little realistic expectation of recovery from that defendant.

However, the record shows that by extending the original credit terms in 1991, GE Capital enabled Comptech to continue its operations for several years; by extending additional credit and forgiving interest penalties despite repeated defaults, the creditor gave Comptech an opportunity to regain its financial stability. GE Capital invested in Comptech from 1989 until the fall of 1994. Comptech's success was in the best interest of both the company which wanted to continue operating, and the creditor who hoped for a return on its investment.

Our thorough review of the record in this case has convinced us that there is no material dispute of fact as to whether or not GE Capital should be held liable as an employer under WARN under any of the legal theories presented by the plaintiff class. Accordingly, we will deny plaintiffs' motion for partial summary judgment on the issue of liability, and grant summary judgment in favor of the defendants. Since we have found in favor of the defendants on the question of liability, we need not reach the defenses asserted in their motion.

An appropriate Order follows.

### ORDER

AND NOW, to-wit, this 16th Day of December, 1999, for the reasons set forth in the accompanying Opinion, it is hereby ORDERED, ADJUDGED, and DECREED that summary judgment be and hereby is entered in favor of the GE Capital defendants and against the plaintiff

class. Accordingly, defendants' motion for summary judgment (Doc. 84) be and hereby is GRANTED, and plaintiffs' motion for partial summary judgment (Doc. 93) be and hereby is DENIED.